**FORD MOTOR COMPANY, Plaintiff,**

v.

**Joe R. TODOCHEENE and Mary Todocheene, as the surviving natural parents of Esther Todocheene, deceased; Tribal Court in and for the Navajo Nation; and the Honorable Leroy S. Bedonie, Defendants.**

**No. CV–02–1100–PCT–PGR.**

United States District Court,
D. Arizona.

Sept. 19, 2002.

Vaughn A. Crawford, Andrew Stewart Ashworth, Snell & Wilmer LLP, Phoenix, AZ, for plaintiff.

Edward D. Fitzhugh, Law Office of Edward D. Fitzhugh, Tempe, AZ, for Marcelino Rodolfo Gomez, Levon B. Henry, Navajo Nation Department of Justice, Window Rock, AZ, for defendants.

## ORDER

ROSENBLATT, District Judge.

This is an action for declaratory and injunctive relief filed by plaintiff Ford Motor Company (hereinafter "Ford") against defendants Joe and Mary Todocheene as the surviving natural parents of Esther Todocheene (hereinafter "Todocheenes"), the District Courts of the Navajo Nation (hereinafter "tribal court") and the Honorable Leroy S. Bedonie, a tribal court judge of the Navajo Nation [1] (hereinafter "Judge Bedonie"). The Complaint alleges that Judge Bedonie, as a sitting judge, on behalf of the District Courts of the Navajo Nation, exceeded the limits of the court's jurisdiction in a tribal court action involving the Todocheenes as plaintiffs and Ford as a defendant. Pending before this Court is Ford's Motion for Preliminary Injunction.

### FACTUAL HISTORY

On June 8, 1998, Esther Todocheene (hereinafter "the decedent"), while employed as a law enforcement officer with the Navajo Department of Public Safety (hereinafter "Navajo DPS"), was involved in a one car motor vehicle accident which occurred on the Navajo reservation. She was driving a Navajo DPS Ford Expedition.

The accident occurred on a dirt road on Navajo land in the state of Utah [2]. As presented to this Court, the road is a reservation road maintained by the Navajo Nation. There is no federal or state right-of-way, nor is it on non-Indian fee land. The parties do not contest this characterization of the road's status.

When the incident occurred, the Ford Expedition rolled and the decedent was ejected from the car. She was fatally injured. The exact cause of the roll-over and ejection are in dispute. Ford claims the decedent was not wearing her seatbelt at the time the vehicle rolled. The Todocheenes contend that the Ford Expedition was defective and, in particular, the seatbelt was not working properly.

### PROCEDURAL HISTORY

On April 21, 2000, the Todocheenes filed a product liability lawsuit against Ford in the Tuba City Division of the Navajo Tribal Court. The Complaint alleges the Ford Expedition driven by decedent was defective and unreasonably dangerous in design or manufacture. The Ford Expedition was designed and manufactured by Ford in Michigan.

On June 13, 2000, Ford filed an Answer to the Complaint in tribal court denying the Expedition was defective and unreasonably dangerous in design or manufac-

---

1. Appearing on behalf of the Navajo Nation District Court and Judge Bedonie is Marcelino Gomez, from the Navajo Nation Department of Justice. Mr. Gomez was careful to point out at oral argument that he represents the court of the Navajo Nation, and is not appearing to defend the specific decisions of the court.

2. Although the accident actually occurred in Utah, Ford explains this matter was filed in the District of Arizona because the underlying tribal court action was filed in a Navajo tribal court located in Arizona.

ture. In addition, the Answer alleged the tribal court lacked both subject matter and personal jurisdiction over the claims against Ford.

On May 25, 2000, Ford improperly removed the tribal court action to federal court on the basis of diversity. The matter was assigned to the Honorable Earl H. Carroll, United States District Court Judge, District of Arizona. On June 13, 2000, the Todocheenes filed a Motion to Dismiss the matter from federal court arguing the federal court lacked subject matter jurisdiction.

On June 27, 2000, the tribal court transferred the action from the Tuba City Judicial District to the Kayenta Judicial District, where it remains pending before Judge Bedonie.[3]

While the matter was pending before Judge Carroll, Ford filed a Motion to Dismiss in tribal court for lack of subject matter and personal jurisdiction on November 21, 2000.[4] While the Motion to Dismiss was pending in tribal court, Judge Carroll issued an Order remanding the case to tribal court on December 20, 2000. Judge Carroll reasoned removal was improper because 28 U.S.C. § 1441(a), the basis for Ford's removal, is not applicable to tribal courts—only state courts.

On January 9, 2001, Judge Bedonie issued an Order denying Ford's Motion to Dismiss. Judge Bedonie concluded Ford submitted itself to tribal court jurisdiction by filing an Answer in Navajo Tribal Court.

Subsequently, the United States Supreme Court rendered an opinion in *Nevada v. Hicks,* 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001). Ford believed *Hicks* "conclusively shows that this court [tribal court] may not exercise jurisdiction over Ford." Accordingly, Ford moved for reconsideration of its Motion to Dismiss, relying on the *Hicks* decision.

On May 16, 2002, Judge Bedonie denied Ford's Motion for Reconsideration. Relying on the Navajo Nation Code, he stated that the tribal court had subject matter jurisdiction "over tort cases pursuant to its 'Courts and Procedure' statute that focuses on damages for injuries."[5] Further, the tribal court asserted that the Navajo Long–Arm Civil Jurisdiction and Service of Process Act conferred jurisdiction.[6] More specifically, Judge Bedonie held,

> Although this Court [tribal court] asserts jurisdiction over Ford based on the contacts with Ford's subsidiary, Ford Credit, anyone in the chain of distribution, from parts manufacturer to retailer, is liable in products liability suits.

**3.** It is unclear to this Court if the transfer occurred pursuant to motion or *sua sponte* as this Court does not have the entire tribal court record before it.

**4.** The Court notes that the matter was transferred to a different district within the tribal court system and Ford filed its Motion to Dismiss in tribal court after the matter had been removed but before it had been remanded. It is uncertain how Ford sought to dismiss an action in tribal court, which Ford removed and was pending in federal court. What was left for the tribal court to dismiss? Similarly, it would seem there was no case for the tribal court to transfer.

**5.** The statute upon which Judge Bedonie relies does not reference subject matter jurisdiction. Nation Code tit. 7 § 701(A)-(D). Rather § 701 addresses the form and content of civil judgments. "In all civil cases, judgment shall consist of...." Nation Code tit. 7 § 701(A)(1995).

**6.** Judge Bedonie relied on the recently passed Long–Arm Civil Jurisdiction and Service of Process Act. Nation Code tit. 7 § 253(a)(C)(4). The Tribal Council passed this statute on or about January 24, 2001. Neither the statute nor Judge Bedonie mention retroactivity even though the tribal court lawsuit was filed on April 21, 2000.

In this case, Ford Credit is an agent of Ford and, thus, they are the same company.

Judge Bedonie aptly noted that this was a "case of first impression" recognizing the absence of federal statutory and case law limiting tribal civil jurisdiction over "non-Indians" on reservation lands that are not fee lands or rights-of-way.

Ford filed a Verified Complaint for injunctive and declaratory relief in this Court on June 13, 2002. Ford's Complaint seeks a restraining order against the Todocheenes, Judge Bedonie, and the District Courts of the Navajo Nation until this Court declares whether or not the tribal court has jurisdiction to hear the Todocheenes' lawsuit. Initially, Ford argued that because Judge Bedonie had scheduled a Pretrial Conference, a trial date might be imminent and trying the matter would cause irreparable harm.

This Court heard arguments on the Motion for Temporary Restraining Order on June 18, 2002 and declined to enter a restraining order at that time. An impending Pretrial Conference with no specific trial date set in tribal court, was insufficient to warrant a finding of irreparable harm under Ninth Circuit precedent. *See Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935 (9th Cir.1987). In addition, sufficient likelihood of success on the merits was questionable since Ford acknowledged it did not exhaust tribal court remedies. The matter was scheduled for a hearing on the Motion for Preliminary Injunction and the parties were given an opportunity to fully brief the issues presented. On July 12, 2002 a hearing on the Motion for Preliminary Injunction took place and the matter was taken under advisement. The following sets forth the Court's opinion on the Motion for Preliminary Injunction.

## DISCUSSION

### A. Standard Governing Preliminary Injunctive Relief

In determining whether to grant preliminary injunctive relief, the Ninth Circuit traditionally considers: (1) the likelihood of success on the merits; (2) the possibility of irreversible injury absent an injunction; (3) the balance of harms; and (4) where appropriate, the public interest. *See United States v. Nutri-cology Inc.*, 982 F.2d 394, 398 (9th Cir.1992); *see also United States v. Odessa Union Warehouse Co-op.*, 833 F.2d 172, 174 (9th Cir.1987); *Caribbean Marine Serv. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir.1988)(a court must consider public interest in balancing hardships when public interest might be affected.)

More recently, the Ninth Circuit has narrowed the traditional test for preliminary injunctive relief and only requires a party to demonstrate either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) that serious questions are raised and the balance of hardships tips in its favor. *See Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir.1987). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1376 (9th Cir.1985).

In rendering its decision, this Court has given great weight to the public interest in addition to considering the likelihood of success on the merits and the possibility of irreparable harm.

### B. District Court Jurisdiction

There are three primary means for initiating federal court actions over controversies involving tribes and their members which arise in Indian country: federal question jurisdiction under 28 U.S.C.

§ 1331; diversity jurisdiction under 28 U.S.C. § 1332; and 28 U.S.C. § 1362 which is only available to Indian tribes.[7] Ford's Complaint asserts jurisdiction on the basis of 28 U.S.C. §§ 1331, 1332, 1343 and 2201.

■ This Court has jurisdiction pursuant to § 1331. *See National Farmers Union Ins. Co. v. Crow Tribe,* 471 U.S. 845, 852, 105 S.Ct. 2447, 2451, 85 L.Ed.2d 818 (1985). "[T]he question whether an Indian tribe retains the power to compel a non-Indian property owner to submit to the civil jurisdiction of a tribal court is one that must be answered by reference to federal law and is a 'federal question' under § 1331." *Id; see also Strate v. A–1 Contractors,* 520 U.S. 438, 448, 117 S.Ct. 1404, 1411, 137 L.Ed.2d 661 (1997).

### C. Tribal Court Jurisdiction

As will be more fully discussed below, the *Hicks* Court specifically left "open the question of tribal-court jurisdiction over nonmember defendants in general." 533 U.S. 353, 358 n. 2, 121 S.Ct. 2304, 2309 n. 2, 150 L.Ed.2d 398 (2001). Since the Supreme Court left that particular question open, this Court must now determine if Ford, a nonmember of the Navajo Nation, should be subject to the jurisdiction of the District Courts of the Navajo Nation.

Assessing tribal court jurisdiction in this case is a complicated process. In undertaking this task, this Court will initially provide a summary of the relevant case law. Next, the Court will provide an analysis under the jurisdictional exceptions set forth in *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). Finally, the Court will address the issue of exhaustion as it relates to this case.

### 1. Governing Case Law

The United States Supreme Court has repeatedly recognized the federal government's long-standing policy of encouraging tribal self-government. *See e.g. Iowa Mutual Ins. Co. v. LaPlante,* 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987); *Three Affiliated Tribes v. Wold Engineering,* 476 U.S. 877, 890, 106 S.Ct. 2305, 2313, 90 L.Ed.2d 881 (1986); *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 138 n. 5, 102 S.Ct. 894, 902, n. 5, 71 L.Ed.2d 21 (1982); *Williams v. Lee,* 358 U.S. 217, 220–21, 79 S.Ct. 269, 270–71, 3 L.Ed.2d 251 (1959). This policy is intended to reflect the Indian tribes' sovereignty over both their members and their territory to the extent that sovereignty has not been withdrawn by federal statute or treaty. *See Iowa Mutual,* 480 U.S. at 14, 107 S.Ct. at 975. Congress has not enacted any federal statute nor is a treaty in place dictating the appropriate forum for adjudicating matters involving civil disputes between Indians and non-Indians in Indian Country.

Thus, whether a tribal court has the power to exercise civil-subject matter jurisdiction over non-Indians is not automatically foreclosed. *See Nevada v. Hicks,* 533 U.S. 353, 358, n. 2, 121 S.Ct. 2304, 2309, n. 2, 150 L.Ed.2d 398 (2001); *see also National Farmers Union,* 471 U.S. at 855–56, 105 S.Ct. at 2453. The existence and scope of a tribal court's jurisdiction requires an in-depth examination of tribal sovereignty, the extent to which that sovereignty has been altered, divested, or diminished, in addition to a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative and judicial decisions. *National Farmers Union,* 471 U.S. at 855–56, 105 S.Ct. at 2453–54.

---

**7.** Ford does not assert jurisdiction under 28 U.S.C. § 1362, as it only applies to tribes

acting as plaintiffs.

*Montana v. United States* is the landmark case addressing tribal civil jurisdiction over nonmembers. 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). *Montana* involved, in part, a claim by the United States and the Crow Tribe that the tribe possessed exclusive jurisdiction within its reservation to regulate nonmember hunting and fishing on nonmember owned fee lands. 450 U.S. at 547, 101 S.Ct. at 1249. Finding no express treaty or statutory right to such regulatory authority, the Supreme Court cited *Oliphant v. Suquamish Indian Tribe*, for the "general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Id.* at 565, 101 S.Ct. at 1258, *citing, Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978). The Supreme Court, however, identified two possible exceptions to the "general proposition": (1) "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter into consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements"; and (2) "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 565–66, 101 S.Ct. at 1258–59.

Ultimately, the Court held that neither of the two exceptions applied to the facts presented in *Montana*, and the tribe lacked the authority to regulate hunting and fishing by non-Indians on land within the tribe's reservations owned in fee simple by non-Indians. *See id.*

In *National Farmers Union v. Crow Tribe,* a Crow Indian minor was struck by a motorcycle in the parking lot of a school located within the Crow Indian Reservation but on land owned by the State of Montana. 471 U.S. 845, 847–48, 105 S.Ct. 2447, 2449, 85 L.Ed.2d 818 (1985). The plaintiff initiated a lawsuit in the Crow Tribal Court against the school district, a political subdivision of the State. *See id.* Default was entered pursuant to the rules of the tribal court, and a judgment was entered against the school district. *See National Farmers Union Ins. Co.,* 471 U.S. at 847–48, 105 S.Ct. at 2449.

Subsequently, the school district filed a verified Complaint and a Motion for Temporary Restraining Order in the District Court for the District of Montana. *See id.* The Complaint named as defendants the Crow Tribe of Indians, the Tribal Council, the Tribal Court, judges of the court, and the Chairman of the Tribal Council. *See id.* It described the entry of default judgment, alleged that a writ of execution might issue on the following day and it asserted that a seizure of school property would cause irreparable injury to the school district. *See id.* The district court issued a restraining order preventing the tribal defendants "from attempting to assert jurisdiction over plaintiffs [the school district] or issuing writs of execution," until otherwise ordered by the district court. *See id.*

After the temporary restraining order expired, a hearing was held on defendant's Motion to Dismiss and plaintiff's Motion for Preliminary Injunction. *See National Farmers Union,* 471 U.S. at 848, 105 S.Ct. at 2450. Subsequently, a permanent injunction was entered and enjoined the tribal defendants against any execution of the tribal court judgment. *See id.* The district court reasoned that the Crow Tribal Court lacked subject matter jurisdiction over the tort that was the basis for the default judgment. *See id.*

On appeal, the Ninth Circuit, without reaching the merits of whether the tribal

court had jurisdiction, concluded that the district court's exercise of jurisdiction could not be supported on any constitutional, statutory, or common-law ground and reversed. *See id.*

Ultimately, the United States Supreme Court held that "the question [of] whether an Indian tribe retains the power to compel a non-Indian property owner to submit to the civil jurisdiction of a tribal court is one that must be answered by reference to federal law and is a 'federal question' under § 1331." *National Farmers Union Ins. Co.*, 471 U.S. at 852, 105 S.Ct. at 2451. Essentially, the Supreme Court reasoned that because the school district argued "federal law has divested the Tribe of this aspect of sovereignty, it is federal law in which they rely as a basis for the asserted right of freedom from the Tribal Court interference." *Id.* at 853, 105 S.Ct. at 2452. The Supreme Court noted the district court "correctly concluded that a federal court may determine under § 1331 whether a tribal court has exceeded the lawful limits of its jurisdiction." *Id.*

While the Supreme Court recognized that the district court properly considered the matter under § 1331, it reversed the judgment because the school district failed to exhaust its tribal court remedies. *See id.* at 856, 105 S.Ct. at 2454.

We believe that examination should be conducted in the first instance in the Tribal Court itself ... Moreover, the orderly administration of justice in the federal court will be served by allowing a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed. The risks of the kind of "procedural nightmare" that has allegedly developed in this case will be minimized if the federal court stays its hand until after the Tribal Court has had a full opportunity to determine its own jurisdiction and to rectify any er-

rors it may have made. Exhaustion of tribal court remedies, moreover, will encourage tribal courts to explain to the parties the precise basis for accepting jurisdiction, and will also provide other courts with the benefit of their expertise in such matter in the event of further judicial review.

*National Farmers Union Ins. Co.*, 471 U.S. at 856–57, 105 S.Ct. at 2454.

The *National Union* Court noted three instances where exhaustion is not mandatory: "where an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith, ... or where the action is patently violative of express jurisdictional prohibitions, or where exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction." *Id; see also Burlington v. Northern Railroad Co. v. Red Wolf*, 106 F.3d 868 (9th Cir.1997)(refusing to apply the futility exception with respect to a claim that federal district court possessed authority to enter preliminary injunction against execution of a $250 million judgment pending exhaustion of tribal court appeal remedies where tribal court has not ruled conclusively on bond amount after remand from tribal appeals court).

Two years after *National Farmers Union*, the United States Supreme Court decided *Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987). In *Iowa Mutual*, an insurer brought an action seeking a declaration that it had no duty to defend or indemnify an insured with respect to an incident which was the subject of a suit against the insurer in tribal court. 480 U.S. at 11, 107 S.Ct. at 973. The underlying tribal court litigation alleged bad faith against Iowa Mutual.

The precise issue before the Supreme Court in *Iowa Mutual* was whether a fed-

eral court may exercise diversity jurisdiction before the tribal court system has an opportunity to determine its own jurisdiction. *See id.* at 11, 107 S.Ct. at 973–74. The Supreme Court extended the holding in *National Farmers Union*—that exhaustion of tribal court remedies was necessary prior to federal judicial review—to matters where diversity jurisdiction is alleged. "Although petitioner alleges that federal jurisdiction in this case is based on diversity of citizenship, rather than the existence of a federal question, the exhaustion rule announced in *National Farmers Union* applies here as well." *id.* at 15, 107 S.Ct. at 976.

The Supreme Court reasoned that in diversity cases, as well as federal-question cases, unconditional access to the federal forum without exhaustion would place it in direct competition with the tribal court, thereby impairing the latter's authority over reservation affairs. *See id.* at 16, 107 S.Ct. at 976; *see also Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106. "Until appellate review is complete the ... [tribal courts] have not had a full opportunity to evaluate the claim and federal courts should not intervene." *Id.* at 17, 107 S.Ct. at 977.

The *Iowa Mutual* Court recognized that the importance of tribal authority over the activities of non-Indians on reservation lands "is an important part of tribal sovereignty and, as such, civil jurisdiction over such activities lies presumptively with the tribal court unless limited by a specific treaty or federal statute." *Id.* at 18, 107 S.Ct. at 977.

Following *Iowa Mutual*, the Supreme Court was presented with the question of whether a tribal court had jurisdiction over a motor vehicle accident between two non-members on a state highway that ran through the reservation. *See Strate v. A–1 Contractors*, 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997). The factual

basis for tribal court jurisdiction is somewhat convoluted. It appears that neither driver was a tribal member, but one of the drivers was a widow of a deceased tribal member and had five adult children who were also members.

The district court dismissed the action relying on *National Farmers Union* and *Iowa Mutual*, determining that the tribal court had civil jurisdiction over the complaint. *See id.* The Eighth Circuit, sitting *en banc*, reversed, concluding that *Montana v. United States* was the controlling precedent and that under *Montana*, the tribal court lacked subject matter jurisdiction. *See id.*

The United States Supreme Court, applying the civil-regulatory jurisdiction standards developed under *Montana*, concluded that adjudicatory jurisdiction was absent because the incident occurred on nontribal lands and involved nonmembers. *See id.* at 442, 117 S.Ct. at 1407–08. The Court noted, however, the outcome might be different if there was a specific statute or treaty authorizing tribal jurisdiction in such situations. *See id.*

Most importantly, the Court stressed that its application of *Montana* was based, in large part, on the fact that the incident occurred on nonmember land. *See Strate*, 520 U.S. at 454–56, 117 S.Ct. at 1413–14. "We can readily agree ... that tribes retain considerable control over nonmember conduct on tribal land... [H]owever, the right-of-way North Dakota acquired for the State's highway renders the 6.59 mile stretch equivalent, for nonmember governance purposes, to alienated, non-Indian land." *Id.*

The Court specifically left open the question of whether tribal court could be an appropriate forum for nonmembers, assuming the accident had occurred on tribal land. *See id.* "We express no view on the governing law or proper forum when an

accident occurs on a tribal road within a reservation." *Id.*

In addition, *Strate* emphasized that *National Farmers* and *Iowa Mutual* enunciate the exhaustion requirement as a "prudential rule," and is not jurisdictional. *Strate,* 520 U.S. at 453, 117 S.Ct. at 1413.

Most recently, in *Nevada v. Hicks*, the United States Supreme Court was again faced with the exhaustion issue. 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001). *Hicks* presented the question of whether a tribal court may assert jurisdiction over "civil claims against state officials who entered tribal land to execute a search warrant against a tribe member suspected of having violated state law outside the reservation." *Id.* at 355, 121 S.Ct. at 2308.

The *Hicks* Court concluded that tribal authority to regulate state officers in executing process related to the violation, off the reservation, of state laws is not essential to tribal self-government or internal relations. *See Hicks,* 533 U.S. at 364, 121 S.Ct. at 2313. The Court reasoned that the State's interest in execution of process considerably outweighed any interest the tribe might have.

The Supreme Court was very specific in limiting the *Hicks* holding. 533 U.S. at 358 n. 2, 121 S.Ct. 2304. "Our holding in this case is *limited* to the question of tribal-court *jurisdiction over state officers enforcing state law. We leave open the question of tribal-court jurisdiction over nonmember defendants in general.*" *Id.* (Emphasis added).

Importantly, the *Hicks* Court reiterates the *Strate* holding, noting adherence to the exhaustion requirement is not necessary when it is "clear" that the tribal court lacks jurisdiction. 533 U.S. 353, 369, 121 S.Ct. at 2315, 150 L.Ed.2d 398.

In *Allstate v. Stump*, the Ninth Circuit held subject matter jurisdiction must be "plainly" lacking before the district court

can conclude that exhaustion is not required. *See Allstate v. Stump,* 191 F.3d 1071, 1072 (9th Cir.1999). The underlying dispute in *Allstate* involved the estates of deceased members of an Indian tribe and an off-reservation insurer over the insurer's alleged bad faith denial of insurance coverage for a fatal automobile accident. *See id.* The *Allstate* accident occurred on a road maintained by the tribe and located on tribal land. *See id.* Allstate filed a declaratory judgment action in district court to challenge tribal court jurisdiction over the estates' suit against Allstate for failure to settle. *See id.*

The district court held the tribal court had jurisdiction and entered judgment for the defendants' estates. *See id.* The Ninth Circuit determined that there was a genuine dispute over whether or not the claim arose on or off the reservation. Namely, it was unclear if the claim arose on the reservation, where the accident occurred and the insureds resided, or off the reservation, where the insurer was located. *See id.* Thus, because it was not plain that the tribal court lacked jurisdiction, exhaustion was required. *See id.* The district court was ordered to stay the action until the matter was exhausted. *See id.*

At oral argument in the matter before this Court, Ford strongly urged the Court to adopt the Eighth Circuit's reasoning in *Hornell Brewing Co. v. Rosebud Sioux Tribal Court,* 133 F.3d 1087 (8th Cir.1998). In *Hornell Brewing,* Hornell brought an action against the tribal court, tribal judge and descendants of Indian spiritual and political leaders, asserting that tribal court lacked jurisdiction over descendants' claim challenging the use of the leader's name, Crazy Horse, in the manufacture, sale, and distribution of malt liquor. *See id.* at 1089.

The United States District Court for the District of South Dakota remanded to tribal court for further proceedings as to personal and subject matter jurisdiction and

enjoined the tribal court from proceeding on the merits. *See id.* All parties appealed. The Eighth Circuit ultimately held that the breweries' manufacture, sale, and distribution of malt liquor did not occur on the reservation land, and tribal court thus did not have jurisdiction over the suit. Moreover, the Eighth Circuit held the advertisement of liquor on the Internet was not a basis for tribal court jurisdiction. *See id.* at 1093–94. Finally, the Court concluded that there was no need for further exhaustion and vacated the remand. *See id.* While the Eighth Circuit case is informative, this Court is bound by the authority provided by the United States Supreme Court and the Ninth Circuit Court of Appeals.

On August 14, 2002, the Ninth Circuit issued an opinion in *McDonald v. Means.*[8] 300 F.3d 1037 (9th Cir.2002). The litigation arises from an accident on Route 5, a Bureau of Indian Affairs (hereinafter "BIA") road within the Northern Cheyenne Indian Reservation in Big Horn County, Montana. *McDonald*, 300 F.3d at 1039–41. Means, a member of the Cheyenne Tribe, was injured when his car struck a horse that had wandered onto Route 5. *See id.* The horse was owned by McDonald, who operated a ranching operation on land he owns in fee within the exterior boundaries of the Northern Cheyenne Reservation. *See id.* McDonald was not a member of the Cheyenne Tribe but was an enrolled member of the Ogalala Sioux Tribe. *See id.*

The action was filed in tribal court alleging that McDonald was negligent in permitting his horse to trespass onto Route 5.

*See id.* McDonald filed suit in the United States District Court, District of Montana, challenging the tribal court's jurisdiction. *See id.* The district court granted summary judgment in favor of McDonald holding that the tribe lacked jurisdiction, enjoined Means from pursuing the matter in tribal court, and rejected the tribe's Motion to Intervene. *See id.* Means appealed the grant of summary judgment, and the Ninth Circuit reversed.[9] The tribe appealed the district court's denial of its Motion to Intervene and the Court affirmed.[10] *See id.*

The primary issue presented in *McDonald* was whether BIA roads, like the state highway considered in *Strate,* are non-Indian fee land subject to the *Montana* rule. *See id.* at 1039–41. The Ninth Circuit concluded that "BIA roads constitute tribal roads not subject to *Strate,* and that the BIA right-of-way did not extinguish the Tribe's gatekeeping rights to the extent necessary to bar tribal court jurisdiction under *Montana." See id.* The Ninth Circuit reasoned that *Strate* was not applicable since the road's status as a BIA road was equal to that of an Indian reservation road. *See id.* at 1041.

Having concluded that Route 5 fell outside the "direct scope" of *Strate,* the Ninth Circuit nonetheless considered whether the facts supported tribal jurisdiction under the general *Montana* rule—that tribes lack authority over the conduct of nonmembers on non-Indian fee land within a reservation. *See id.* The Ninth Circuit determined the facts supported tribal court jurisdiction noting that *Montana* referred to the conduct of *nonmembers* on

---

8. The opinion in *McDonald* was issued after oral argument in this matter had taken place. The parties were permitted to provide limited supplemental briefing on the application of *McDonald.*

9. Since the issuance of the *McDonald* opinion a Petition for Rehearing has been filed.

10. In the matter before this Court, the Navajo Nation District Court was named as a defendant, but not the Navajo Nation. Accordingly, the Ninth Circuit's discussion of intervention is irrelevant to the issues before this Court and it will not be addressed.

*non-Indian* fee land within a reservation and "Route 5 [could not] be considered non-Indian fee land." *See id.* at 1042. In making this determination, the Ninth Circuit reasoned that the BIA holds a fiduciary relationship to Indian tribes, and its management of tribal right-of-way is subject to the same fiduciary duties. *See id.*

*McDonald* is distinguishable from the case before this Court for two essential reasons. First, the Ninth Circuit relies exclusively on the land status of the road as the determinative factor in rendering its decision. *See id.* at 1039–44. In this matter the status of the land, while not insignificant, is not considerably important. The case before this Court involves an automobile accident, but the underlying cause of action is product liability.

Assuming this Court strictly applied *McDonald*, all product liability torts, in fact all litigation, would be subject to tribal court jurisdiction if the injury occurred on Indian land—and solely because it occurred on Indian land. This is problematic because any manufacturer, or any individual, would be subject to litigation in tribal court simply because the injury occurred on Indian land. Yet, if the same product were in use but the land happened to be non-Indian fee land, then the jurisdictional outcome might be different.

Second, McDonald's horse "wandered" onto Route 5 from McDonald's fee land located within the boundaries of the Cheyenne reservation. *See id.* at 1039. Without examining the law governing livestock, it is foreseeable that trespass will occur under these circumstances such that the tribe, as a whole, has a significant interest in exercising its sovereignty with respect to keeping livestock off the public, tribal roads.

### 2. The Montana Exceptions

As noted above, there are two sources of tribal court jurisdiction against nonmembers. Either positive law, by way of statute or treaty, or through the inherent sovereignty of the tribe. *Montana*, 450 U.S. at 564, 101 S.Ct. at 1257. The parties concede there are no statutes or treaties governing the jurisdictional questions in this case. Accordingly, this Court must analyze the facts as they relate to jurisdiction based on the inherent sovereignty of the tribe.

 This Court begins with the general rule that tribal courts do not generally have jurisdiction over nonmembers. *See Montana*, 450 U.S. at 565, 101 S.Ct. at 1258. The Supreme Court in *Montana* explained, however, that tribes retain the power to regulate "the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." 450 U.S. at 565, 101 S.Ct. 1245. The Court stated that tribes "may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Id. at 566, 101 S.Ct. 1245.

#### a. Consensual Relations

The Todocheenes argue that Ford entered into a consensual relationship with the tribe because the allegedly defective seatbelt caused the injury on the Navajo Reservation and Ford Credit financed the tribe's bulk-purchase of vehicles six times since 1990.[11] The Todocheenes contend

---

11. Apparently, Judge Bedonie was unable to find any consensual relationship between Ford Motor Company and the Todocheenes

noting that Ford does not have any dealerships, offices or real estate within the Navajo reservation. Accordingly, he relied on the

that Ford Credit committed specific activities in an effort to solicit the tribe's business. Namely, Ford engaged in a competitive bidding process and provided tax-exempt financing to the tribe to encourage the bulk purchasing of vehicles. Judge Bedonie noted, "[t]hese activities resulted in the lease-sale contracts that underlie the consensual relationship between the tribe and Ford."

The contracts provide that Ford Credit loan the tribe the money to purchase the vehicles and that, until such time as the tribe pays off the loan, Ford Credit has a security interest in said vehicles. For the 1996 bulk-purchase, which included the Ford Expedition involved in the decedent's accident, Ford Credit had a security interest in those vehicles until the loan was paid in full in April 2001.

In addition, the Todocheenes heavily rely on the forum selection clause contained in the Ford Credit contracts to support tribal court jurisdiction. These contracts provide that "actions which arise out of this Lease or out of the transaction it represents shall be brought in the courts of the Navajo Nation." Essentially, the Todocheenes contend that by entering into automobile financing contracts with the tribe, Ford should be deemed to have constructively agreed to submit to the jurisdiction of the tribal court for any tort claims arising out of its presence on the reservation.

Ford argues this concept of consent to tribal court jurisdiction is vastly overbroad. *Montana's* consensual relationship exception requires that there be a nexus between the regulation imposed by the Indian tribe and the consensual relationship itself. *See Atkinson Trading Co.*, 532 U.S. 645, 656, 121 S.Ct. 1825, 1833, 149 L.Ed.2d 889 (2001). Taken to its logical conclusion, this concept could subject anyone who entered the boundaries of the reservation to tribal court jurisdiction for any type of claim on the ground that their very presence on the reservation represented constructive consent to any foreseeable lawsuit. Arguably, such an exception would swallow the basic rule established in *Montana* that tribes ordinarily will not have jurisdiction over the activities of non-Indians.

The *Strate* Court identifies several cases which fall within the consensual relationship exception. *Strate*, 520 U.S. at 457, 117 S.Ct. at 1415. The cases serve as an indication of the "type of activities the Court had in mind" when applying the first exception: *Williams*, 358 U.S. at 223, 79 S.Ct. at 272 (declaring tribal jurisdiction exclusive over lawsuits arising out of on-reservation sales transaction between non-member plaintiff and member defendants); *Morris v. Hitchcock*, 194 U.S. 384, 24 S.Ct. 712, 48 L.Ed. 1030, (1904) (upholding tribal permit tax on nonmember-owned livestock within boundaries of the Chickasaw Nation); *Buster v. Wright*, 135 F. 947, 950 (8th Cir.1905) (upholding Tribe's permit tax on nonmembers for the privilege of conducting business within Tribe's borders; court characterized as "inherent" the Tribe's "authority . . . to prescribe the terms upon which noncitizens may transact

relationship between Ford Motor Credit, a wholly-owned subsidiary of Ford Motor Company, and Ford Motor Company, the manufacturer of the Expedition and defendant in the tribal court case. Judge Bedonie found that because Ford Motor Credit has "continuously conducted business on the Reservation and engaged in contractual relations with the Tribe and its members. . .engaged in activities to solicit the Tribe's business. . .provided tax-exempt financing to the Tribe for its bulk-purchases" it is the "alter ego" of Ford Motor Company. Therefore, Judge Bedonie concludes, the tribal court may attribute the subsidiary's contacts (Ford Motor Credit) to the parent Corporation (Ford Motor Company) to establish that Ford Motor Company consented to tribal court jurisdiction.

business within its borders"); *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 152–154, 100 S.Ct. 2069, 2080–2082, 65 L.Ed.2d 10 (1980) (tribal authority to tax on-reservation cigarette sales to nonmembers "is a fundamental attribute of sovereignty which the tribes retain unless divested of it by federal law or necessary implication of their dependent status"). Measured against these cases, a products liability case involving a single car roll-over and an allegedly defective seatbelt presents a questionable consensual relationship at best.

To the extent that tribal jurisdiction can be conferred by consent, it should be real consent. A non-Indian who enters into a contract with the tribe or a member of the tribe that specifically provides for submission to tribal court jurisdiction should be bound by that agreement. But without such explicit consent, the mere fact that a non-Indian was on the reservation, or a manufacturer's product was in use, is not enough to confer jurisdiction in the tribal courts over all conceivable claims arising out of the non-Indian's presence on the reservation.

■ That ought to be particularly true in this case, where the contract between Ford Motor Credit and the tribe contained an exclusive forum selection clause related only to disputes connected to the lease and financing contract. Ford Motor Company can hardly be deemed to have consented to tribal court jurisdiction over any foreseeable tort claims arising out of the use of Ford vehicles on the reservation simply because Ford Motor Credit agreed to litigate lease/financing disputes in tribal court.[12] This lawsuit is wholly unrelated to the financing and lease agreement between Ford Motor Credit and the tribe. No part of the agreement is relevant to the Todocheenes' *prima facie* case or to Ford's defenses.

### b. Tribal Self–Government

The second *Montana* exception may provide a basis for tribal courts to exercise jurisdiction over nonmembers where the conduct of nonmembers "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 566, 101 S.Ct. at 1258. The argument that jurisdiction over tort claims is necessary to preserve political integrity of the tribe as sovereigns would permit tribal courts to assume jurisdiction over any claim raised by reservation residents. Similarly, the claim that jurisdiction must be recognized in order to enable the tribes to protect the health and welfare of their members would allow a tribe to exercise civil jurisdiction over virtually any tort claim, simply by asserting an interest in discouraging negligent and other wrongful conduct on the reservation.[13]

12. Assume the forum selection clause of a financing agreement applied to all tort actions; in all Ford Credit financing and lease agreements, Ford could select Michigan as the appropriate forum. Thus, anytime Ford was named in a tort action and Ford Motor Credit was determined the alter ego of Ford Motor Company, plaintiffs would be required to file suit in Michigan.

13. Arguably, this argument could be used to allow tribal courts to assume jurisdiction over non-Indians who have never even set foot on the reservation. Under the Navajo Nation Long–Arm Civil Jurisdiction and Service of Process Act, the tribal court has jurisdiction over off-reservation activities that have an impact on the reservation. "A court of the Navajo Nation may exercise personal and subject matter jurisdiction over any non-member who consents to jurisdiction by ... any action or inaction which causes injury which affects the health, welfare, or safety of the Navajo Nation or any of its members, or any other act which constitutes the assumption of tribal relations and the resulting express or implied consent to jurisdiction." Nation Code tit. 7 § 253a(C).

If the second *Montana* exception is to be applied at all to the question of the scope of tribal court jurisdiction, it should be applied narrowly to ensure that tribal court jurisdiction is, in fact, permitted only in those rare cases where the particular conduct in question has a substantial impact on the tribe as a whole. Automobile accidents and products liability claims, by their very nature, do not meet this standard because such litigation impacts only the individuals involved and not the tribe as a whole.

Even in situations where an effect can be found on the tribe as a whole, that does not necessarily give the tribe the power to adjudicate claims against a non-Indian. Most tortious acts are already covered by the common law, and remedies are available in state and federal court for breach of those duties. Members are protected by existing state laws and state remedies. Thus, it is not necessary to provide a forum for claims against non-Indians in order to protect the health or welfare of tribal members as a whole or the tribe's interest in tribal self-government.

Ford requests this Court consider *Atkinson Trading Co. Inc. v. Shirley*, 532 U.S. 645, 121 S.Ct. 1825, 149 L.Ed.2d 889 (2001). *Atkinson* involved a non-Indian proprietor of a hotel located on non-Indian fee land within the boundaries of the Navajo Reservation. 532 U.S. at 647, 121 S.Ct. at 1829. Atkinson brought suit in tribal court challenging the Navajo Nation's authority to impose a tax on his business. *See id.* Atkinson's challenge under *Montana* was rejected by both the Navajo Tax Commission and the Navajo Supreme Court. *See id.* Atkinson then sought relief in the United States District Court for the District of New Mexico. *See id.* The district court also upheld the tax. A divided panel of the Tenth Circuit affirmed. 210 F.3d 1247 (10th Cir.2000).

The Supreme Court held that the tribe's imposition of the hotel occupancy tax on non-Indian fee land was invalid. The Court determined the consensual relationship must stem from the commercial dealing, contracts, leases, or other arrangements, and that a nonmember's actual or potential receipt of tribal police, fire, and medical services did not create a sufficient connection. *See Atkinson*, 532 U.S. at 655, 121 S.Ct. at 1833. If it did, the Court noted, the exception would swallow the rule because all non-Indian fee lands within a reservation benefit, to some extent, from the advantages offered by the Indian tribe. *See id.*

Moreover, the *Atkinson* Court declined to apply the second *Montana* exception. *See id.* at 657, 121 S.Ct. at 1834. The Court failed to see how the operation of a hotel on non-Indian fee land "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.*

Ford argues that if the Supreme Court in *Atkinson* determined the collection of a hotel occupancy tax imposed by the tribe does not have a direct effect on the tribes economic security or political integrity, then certainly an individual tort action has no such effect. *See id* at 653–59, 121 S.Ct. at 1832–35.

■ There may be rare situations where state and federal court remedies are insufficient to protect a strong tribal interest against a non-Indian's allegedly tortious activity. However, a single vehicle roll-over underlying a products liability lawsuit does not require a unique tribal court remedy and is not likely to be the type of conduct that the Supreme Court intended to fall within the second *Montana* exception as it does not threaten or have a sufficiently adverse effect on the political integrity, the economic security, or the health or welfare of the tribe as a whole.

To hold otherwise could create a tumultuous situation where tribal courts would be able to regulate the conduct of non-Indians by, among other things, developing their own individual tort systems and law in deciding liability and imposing damages for such claims. In fact, Judge Bedonie, in his May 16, 2002, Order denying Ford's Motion for Reconsideration, opines that "Navajo Courts should synthesize Navajo Custom Law with due process to enhance Navajo Culture when interpreting the NNBR [Navajo Nation Bill of Rights] and the ICRA [Indian Civil Rights Act]." Judge Bedonie emphasizes this point, by referring to the Navajo coyote stories, and, specifically, the story of Coyote and Skunk, as an illustration of how Navajo due process comports with federal law.[14]

Interpreting the second *Montana* exception consistent with the Todocheenes', the tribal court's and Judge Bedonie's argument is directly contrary to the fundamental premise of the *Montana* decision, which is that the tribes' status as dependent sovereigns necessarily entails a sharp limitation on their jurisdiction over nonmembers.

### 3. Exhaustion

■ As noted above, the Supreme Court favors exhaustion at the tribal court level prior to seeking review in federal court. *National Farmers Union*, 471 U.S. at 856, 105 S.Ct. at 2454. The decisions in *National Farmers Union* and *Iowa Mutual* "describe an exhaustion rule allowing tribal courts initially to respond to an invocation of their jurisdiction." *Strate*, 520 U.S. at 448, 117 S.Ct. 1404 (1997). The rule, however, is "not an unyielding requirement." *Id.* at 449 n. 7, 117 S.Ct. at 1411. "It is 'prudential,' not jurisdictional." *Id.* at 451, 117 S.Ct. at 1412.

Moreover, *National Farmers Union* recognizes three exceptions to the exhaustion requirement: (1) when tribal court jurisdiction is motivated by a desire to harass or is conducted in bad faith; (2) the action is patently violative of express jurisdictional prohibitions; or (3) exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction. *See Hicks*, 533 U.S. at 369, 121 S.Ct. at 2315.

In this case, the court is only concerned with the second circumstance—whether the action is patently violative of express jurisdictional prohibitions. The parties agree there are no allegations of bad faith or harassment and the opportunity for appeal is adequate.

The Todocheenes, Judge Bedonie, and the tribal court assert relatively little argument with respect to the merits of the jurisdictional issue. Instead, they focus primarily on exhaustion and request the tribal court have a full opportunity to address the issue in the first instance. They

---

**14.** In his Order, Judge Bedonie states that, "[i]n the story of Coyote and Skunk, Coyote and Skunk conspired and killed prairie dogs for food. They buried the food to cook it. In an attempt to get all the food for himself and cheat Skunk, Coyote suggested a running contest to determine each's share. Skunk agreed to the contest knowing Coyote's intent. Coyote allowed Skunk a lead start as Skunk had shorter legs. When Skunk was out of Coyote's sight, Skunk hid, allowing Coyote to pass by without being seen. Skunk went back and took all the food for himself. When Coyote came back to get the food for himself, he found Skunk up high on a rock with all the food. Coyote begged to reestablish good relations to get some of the food, but Skunk refused. Skunk did not give Coyote the opportunity for a fair contest because Coyote attempted to cheat Skunk in the first place. Because of these events, *Doo hwona'adlo'da— Haahaneeh!* (One should not be deceptive or he will lose!). If one does not play fair, he will lose." Judge Bedonie then states that this type of analysis allows the tribal court to consider "all parties equally as relatives" therefore, comporting with due process.

note that this Court may undertake a review of the tribal court's determination at a later time. Ford argues that the lack of jurisdiction in tribal court is so abundantly clear that exhaustion is unnecessary and would only serve to further delay the resolution of this case.

Supreme Court precedent varies slightly in the terms used to describe the degree to which the tribal court must lack jurisdiction. As previously noted, *National Farmers Union* requires that the action be *"patently violative* of express jurisdictional prohibitions" in order to conclude exhaustion is not necessary. 471 U.S. at 857 n. 21, 105 S.Ct. at 2454 n. 21. (Emphasis added). *Strate* observed that once it is *"plain* that no federal grant provides for tribal governance of nonmembers' conduct . . . state or federal courts will be the only forums competent to adjudicate those disputes . . . Therefore, . . . the otherwise applicable exhaustion requirement . . . must give way. . . ." 520 U.S. at 459 n. 14, 117 S.Ct. at 1416 n. 14. (Emphasis added). In *Hicks,* the United States Supreme Court reasoned that because "it is *clear* . . . that tribal courts lack jurisdiction over state officials' . . . adherence to the exhaustion requirement in such cases 'would serve no purpose other than delay,' and is therefore unnecessary." 533 U.S. at 369, 121 S.Ct. at 2315.

Ford has not sought any type of review beyond the trial court level. At minimum, the Navajo Nation Code provides for a discretionary petition for review with the Navajo Supreme Court. Nation Code tit. 7 § 303 (1995). The Court is troubled that Ford has not yet initiated any such review.

This Court recognizes that such a petition is discretionary and the Navajo Supreme Court may decline review. A denial of such a petition, while not providing any clear guidance to this Court, might provide some insight as to whether the exhaustion requirement is appropriate.

For instance, the Navajo Supreme Court would likely take the opportunity to address Judge Bedonie's reliance on Ford Motor Credit as the alter ego of Ford Motor Company and the scope of the Navajo Nation Long–Arm Civil Jurisdiction and Process Act. In any event, Ford has not put forth any effort in this regard.

Further, requiring Ford to seek discretionary review would not result in any substantial hardship to Ford. Ford would not be required to proceed to the completion of a costly trial but would only incur fees associated with the filing and argument of the petition—more than likely, nothing more than was incurred in filing the instant Motion for Preliminary Injunction. Ford's inaction begs the obvious question: If the lack of tribal court jurisdiction is so clear-cut, then would it not be similarly evident to the Navajo Supreme Court?

As an alternative, Ford could be required to seek appellate review with the Navajo Supreme Court once judgment is entered. Nation Code tit. 7 § 302. The matter is not yet ripe for appellate review, however, the appellate process is the typical method for exhaustion.

Requiring Ford to exhaust is not necessarily dispositive of the issues presented. Assuming the Navajo Supreme Court upheld the lower court's determination that the tribal court has jurisdiction, Ford may still challenge the ruling in this Court. *National Farmers Union,* 471 U.S. at 853, 105 S.Ct. at 2452.

While the Supreme Court has decided several cases over the past few years dealing with tribal court jurisdiction and, in particular, exhaustion of tribal court remedies, the facts presented in this case do not fit squarely into any of the aforementioned cases. The early cases favor exhaustion while the more recent cases tend to find exceptions to the exhaustion requirement.

None of the cases cited by the parties or discussed above is exactly on point.

■■ Ultimately, however, this Court's review of the record and relevant law reveals that exhaustion is unnecessary because tribal court jurisdiction is clearly lacking under the *Montana* analysis. It is well established that where the tribal court plainly lacks jurisdiction, exhaustion serves no other purpose than delay and is, therefore, unnecessary. *Nevada,* 533 U.S. at 369, 121 S.Ct. at 2315.

In making this determination, the Court focuses on the general rule set forth in *Montana*—that tribes generally lack civil jurisdiction over nonmembers—while analyzing the applicability of the consensual relationship and tribal sovereignty exceptions to *Montana's* general rule.

The Todocheenes rely primarily on the forum selection clause of the financing agreement between Ford Motor Credit and the Navajo Nation wherein Ford Motor Credit consented to tribal court jurisdiction for actions arising out to the lease and financing agreements. Clearly, the forum selection clause of a lease/financing contract does not confer jurisdiction of tort actions to the tribal court.

The Expedition was sold to the Navajo Nation for use by its Department of Public Safety. Assuming, in arguendo, the forum selection clause did cover tort actions, the clause is part of an agreement between Ford Motor Credit and the Navajo Nation as a governmental entity, not the Todocheenes or the decedent. There is no consensual relationship between Ford Motor Company or Ford Motor Credit and the Todocheenes.

With respect to the second *Montana* test, this Court concludes that tribal court jurisdiction over this action is not neces-sary to preserve the tribe's sovereignty. Jurisdiction over a single vehicle roll-over does not have a substantial impact on the tribe as a whole since it is not a threat to the political integrity, economic security, or health or welfare of the tribe. *Montana,* 450 U.S. at 566, 101 S.Ct. at 1258.

## D. Injunctive Relief

■ As noted above, this Court considers a combination of probable success on the merits, possibility of irreparable harm, and the public interest in determining the appropriateness of injunctive relief. *See United States v. Nutri-cology, Inc.,* 982 F.2d at 398; *see also Arcamuzi,* 819 F.2d at 937. The success on the merits and irreparable injury prongs of the preliminary injunction standard tend to focus on the moving parties position. It is recognized, however, that a district court must carefully weigh the interests of all parties. *See Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975).

### 1. Likelihood of Success on the Merits

The requirement that Ford demonstrate likely success on the merits is easy to grasp in principle—if Ford is to be granted relief upon a preliminary review of its case, the case had better look good.[15] It becomes complicated when the Court must decide how good Ford's case must be.

Success on the merits is somewhat arguable in this case since there is no clear precedent for the issues presented. That is not to say there is not significant authority in the area of tribal court jurisdiction, there is; rather, the precedent is very narrowly tailored to the facts of each individual case and continually evades the un-

---

**15.** Joseph T. McLaughlin & Harmeet Dhillon, Litigation and Administrative Practice Court Handbook Series. Preliminary Injunctive Re-lief in the Federal Courts, 6 (Practicing Law Institute eds.1996).

derlying issue of civil jurisdiction as to nonmember defendants. *Hicks,* 533 U.S. at 358 n. 2, 121 S.Ct. at 2309 n. 2.

In looking at the merits of this action however, the Court finds Ford has demonstrated a sufficient likelihood of success. Success is demonstrated by reference to the two *Montana* tests. Ford cannot be deemed to have consented to tribal court jurisdiction under the facts and arguments presented in this case.

Further, the sovereignty of the tribe is not in jeopardy by concluding the tribal court does not have jurisdiction. In making this decision, this Court is not interfering with the tribe's right to adjudicate matters between its members or nonmembers who consent to tribal court jurisdiction; rather, this Court is merely requiring adherence to *Montana* and its progeny.

### 2. Irreparable Harm

It is the threat of irreparable harm that provides the situation its urgency. *See Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1802, 72 L.Ed.2d 91 (1982). Simply stated, the threat of irreparable harm renders the situation urgent because it means a party is in danger of losing something irretrievable. 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 p. 139 (2d ed.1995).

Ford argues it will suffer irreparable harm if the tribal court is not enjoined primarily because of the substantial costs incurred defending a matter at trial and appealing an unfavorable decision. This argument is not very compelling to this Court. When balancing the economic hardship of Ford as weighed against the Todocheenes, the scale is basically even. Certainly, Ford will incur costs, potentially minimal if they were to seek discretionary review, or substantial, if forced to proceed through trial and an appeal; but this is

basically equal to the economic hardship of the Todocheenes'. The Todocheenes will most likely have to refile the action in a different court or will choose to challenge this Court's ruling at the Ninth Circuit. Either way, both sides are likely to suffer some financial repercussions.

Similarly, both parties have an equal interest in seeing the matter quickly resolved. The Todocheenes certainly have waited patiently for the resolution of this matter. Their daughter died in June of 1998, and the action is just now ready to proceed to trial in September, 2002.

On the other hand, because jurisdiction is so clearly lacking, the Todocheenes may be forced to endure the process of exhaustion, as well as subsequent review in this Court if injunction did not issue, thereby unnecessarily delaying adjudication. *See Nevada,* 533 U.S. at 369, 121 S.Ct. at 2315.

Ford has comparable timeliness concerns. Since tribal court jurisdiction is so clearly lacking, Ford obviously has no interest in delaying the adjudication of the matter by expending time at trial and appealing any unfavorable judgment with the Navajo court system.

### 3. Public Interest

The final, and perhaps most determinative factor considered by the Court, is the public interest. In doing so, the court is permitted to inquire whether there are policy considerations that bear on whether an injunction should issue. Federal Practice and Procedure § 2948.4 p. 200–01. Essentially, the Court must weigh the public's interest in permitting the Navajo tribal court to adjudicate any matter brought before it against the extension of civil tribal court jurisdiction to non-consenting nonmembers.

"Indian tribes occupy a unique status under our law." *National Farmers Un-*

*ion,* 471 U.S. at 850, 105 S.Ct. at 2451. Early on, tribes exercised virtually unrestrained power over their own members as well as those permitted to join tribal communities. *See id.* "Today, however, the power of the Federal Government over Indian tribes is plenary." *Id.* Federal law, be it statute, treaty, administrative regulation, or judicial decision, provides considerable protection for the individual, territorial, and political rights of the tribes. *See id.*

Certainly, there are compelling arguments in favor of both sides. The Navajo tribe certainly has a strong interest in protecting its ability to adjudicate matters brought within its own court system. Federal law generally supports this interest with respect to members of the tribe. However, this interest is restricted as is relates to nonmembers. *See Montana,* 450 U.S. at 565–66, 101 S.Ct. at 1258–59.

The fundamental argument is that tribes should have jurisdiction over all claims brought within its tribal court system, because if not, tribal sovereignty is adversely affected. This is directly contrary to *Montana* and its progeny and not in the public's best interest.

### CONCLUSION

Congress has yet to provide any meaningful legislation dealing with the issue of subject matter jurisdiction in tribal court. As such, the federal courts have been left with the enormous task of determining tribal court jurisdiction on a case-by-case basis through constructing various tests and then, similarly, carving out various exceptions. Analysis of this particular case is rather complicated insofar as it does not neatly fit into any one of the Supreme Court or Ninth Circuit precedents related to tribal court jurisdiction.

This Court has determined that the *Montana* exceptions are not applicable and applies its general rule. Ford Motor Company did not consent to tribal court jurisdiction for tort claims by virtue of Ford Motor Credit entering into lease/financing agreements with the tribe. Moreover, a single vehicle roll-over accident which prompted the pending products liability action does not have a threatening or direct effect on the tribe's political integrity, economic security, or the health or welfare of the tribe. That having been said, this Court is left with the issue of exhaustion.

Based on the above analysis, this Court has concluded that exhaustion is not necessary since jurisdiction is so clearly lacking it would only serve to unnecessarily delay the adjudication of this matter.

IT IS ORDERED that Ford's Motion for Preliminary Injunction (**Doc. 3**) is GRANTED.

IT IS FURTHER ORDERED that defendants are enjoined from prosecuting, taking any action or conducting any proceedings in furtherance of *Joe and Mary Todocheene v. Ford Motor Company,* Cause No. KY–CV–191–2000, the products liability action pending in the District Courts of the Navajo Nation.

IT IS FURTHER ORDERED that bond is set in the amount of $20,000.00.

IT IS FURTHER ORDERED that this matter is set for a Rule 16 Scheduling Conference on **Monday, October 28, 2002 at 1:30 p.m.**[16]

---

**16.** The parties should be prepared to discuss whether the imposition of a permanent injunction is appropriate without further proceedings.