**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FORD MOTOR COMPANY,
           *Plaintiff-Appellee,*

v.

JOE R. TODECHEENE, as the
surviving natural parent of Esther
Todecheene, deceased; MARY
TODECHEENE, as the surviving
natural parent of Esther
Todecheene, deceased,
           *Defendants-Appellants,*

and

NAVAJO NATION DISTRICT COURT;
LEROY S. BEDONIE, The Honorable,
           *Defendants.*

No. 02-17048

D.C. No.
CV-02-01100-PGR

FORD MOTOR COMPANY,
            *Plaintiff-Appellee,*

v.

JOE R. TODECHEENE, as the
surviving natural parent of Esther
Todecheene, deceased; MARY
TODECHEENE, as the surviving
natural parent of Esther
Todecheene, deceased,
            *Defendants,*

and

NAVAJO NATION DISTRICT COURT;
LEROY S. BEDONIE, The Honorable,
            *Defendants-Appellants.*

No. 02-17165

D.C. No.
CV-02-01100-PGR

OPINION

Appeal from the United States District Court
for the District of Arizona
Paul G. Rosenblatt, District Judge, Presiding

Argued and Submitted
July 7, 2003—Pasadena, California

Filed January 11, 2005

Before: Barry G. Silverman, William A. Fletcher, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Rawlinson;
Dissent by Judge William A. Fletcher

## COUNSEL

Edward D. Fitzhugh, Tempe, Arizona, for defendants-appellants Joe R. and Mary Todecheene.

Luralene D. Tapahe, Staff Attorney, Navajo Nation Department of Justice, Window Rock, Navajo Nation, Arizona, for defendants-appellants Navajo Nation District Courts.

Richard A. Derevan, Snell & Wilmer, L.L.P., Irvine, California, for plaintiff-appellee Ford Motor Company.

## OPINION

RAWLINSON, Circuit Judge:

In this case, we ascertain the extent to which a tribal court may exercise jurisdiction over a products liability action aris-

ing out of an accident occurring on tribal trust land. Because we conclude that the tribal court lacked jurisdiction over Ford Motor Company (Ford), we **AFFIRM** the district court.

## I.  *FACTS AND PROCEDURAL HISTORY*

Tragically, Esther Todecheene, an on-duty law enforcement officer employed by the Navajo Department of Public Safety, died when her Ford Expedition patrol vehicle rolled over while she was driving on a dirt road within the Navajo Nation. *Ford Motor Co. v. Todecheene*, 221 F. Supp. 2d 1070, 1072 (D. Ariz. 2002). The road is a reservation road, maintained by the Tribe. There is no federal or state right-of-way, and the road is not located on non-Indian fee land.

The cause of the rollover accident is disputed. Ford asserts that Todecheene was not wearing a seatbelt. Esther's parents, the Todecheenes, counter that the Ford Expedition was defective and the seatbelt was not working properly.

The Todecheenes sued Ford in Navajo tribal court alleging that the Ford Expedition, designed and manufactured in Michigan, was defective and unreasonably dangerous in design or manufacture. Ford answered the complaint, denying the allegations. Ford also challenged the tribal court's subject matter jurisdiction over the action and personal jurisdiction over Ford, and removed the case to federal court.[1] The district court subsequently remanded the matter to tribal court, ruling that the federal removal statute, 28 U.S.C. § 1441, did not provide for removal of actions from tribal court to federal court.

Ford Motor Credit Company (Ford Credit), Ford's wholly-owned subsidiary, financed the purchase of the Expedition

---

[1]Because our resolution of the subject matter jurisdiction question is outcome-determinative, we need not address the personal jurisdiction issue.

driven by Todecheene, as well as six bulk-purchases of vehicles over an eight-year period. Considering this circumstance, the tribal court determined that the resultant lease-sale contracts created a consensual relationship between Ford and the tribe. The court relied in part upon a contract provision stating that "[a]ll actions which arise out of this Lease or out of the transaction it represents shall be brought in the courts of the Navajo Nation." Additionally, the court referenced the fact that Ford conducted advertising targeted toward residents of the Navajo reservation. The tribal court also determined that it had subject matter jurisdiction over the action under a tribal statute providing for money damages in tort cases. The court concluded that product liability and wrongful death claims fell within the ambit of the tribal statute, even though the tribal court had never decided a product liability claim.[2]

Ford did not appeal the tribal court ruling. Instead it sought injunctive and declaratory relief in federal court to halt the tribal court proceeding. The district court issued the requested preliminary injunction, analyzing the tribal court's jurisdiction under *Montana v. United States*, 450 U.S. 544 (1981). The district court also held that Ford was not required to exhaust tribal court remedies before challenging the tribal court's jurisdiction in federal court, because jurisdiction was plainly lacking and exhaustion would serve only to delay the proceedings.

The Todecheenes and the Navajo Nation filed timely appeals.

## II. STANDARDS OF REVIEW

Whether a tribal court properly exercised its jurisdiction is

---

[2]The Appellants did not argue this theory of subject matter jurisdiction in their Opening Briefs. *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1069 n.18 (9th Cir. 2000) (concluding that failure to provide any legal argument in support of a contention waived that argument).

a question of law reviewed *de novo*. *AT&T Corp. v. Coeur D'Alene Tribe*, 295 F.3d 899, 904 (9th Cir. 2002). The tribal court's findings of fact are reviewed under a clearly erroneous standard. *FMC v. Shoshone-Bannock Tribes*, 905 F.2d 1311, 1313 (9th Cir. 1990).

"[W]hether the district court was required to abstain from granting or denying an injunction when a party has failed to exhaust tribal court remedies" is reviewed *de novo*. *El Paso Nat'l Gas Co. v. Neztsosie*, 136 F.3d 610, 613 (9th Cir. 1998), *rev'd on other grounds*, 526 U.S. 473 (1999).

A district court's order regarding preliminary injunctive relief is reviewed for abuse of discretion. *See Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 626 (9th Cir. 2003). The district court abuses its discretion when it bases its decision on an erroneous legal standard or on clearly erroneous findings of fact. *Id*. Where the district court's ruling rests solely on law and the facts are established or undisputed, review is *de novo*. *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 964-65 (9th Cir. 2002).

## III.  DISCUSSION

### A.  The Tribal Court's Subject Matter Jurisdiction Over the Products Liability Action

[1] Analysis of Indian tribal court civil jurisdiction begins with *Montana v. United States*. In that case the United States Supreme Court held that an Indian tribe could not regulate hunting and fishing by non-Indians on non-Indian owned fee land within the reservation. The Court acknowledged that "Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands." 450 U.S. at 565.[3] The

---

[3]The tribal court did not assert jurisdiction pursuant to a treaty or federal statute.

Court then set out two instances in which tribes could exercise such sovereignty: (1) "A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealings, contracts, leases, or other arrangements." *Id.* (citations omitted); and (2) "A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health and welfare of the tribe." *Id.* at 566 (citations omitted).

**[2]** The United States Supreme Court relied upon *Montana* in *Strate v. A-1 Contractors*, 520 U.S. 438 (1997), holding that a tribal court had no jurisdiction to hear a personal injury lawsuit brought by a tribal member against a non-tribal member driver and his non-tribal employer concerning a car accident that occurred on a "State highway running through [a reservation]." *Id.* at 442. The Court explained that, under Supreme Court precedent, "absent express authorization by federal statute or treaty, tribal jurisdiction over the conduct of nonmembers exists only in limited circumstances." *Id.* at 445. The Court characterized *Montana* as limiting tribal authority over the conduct of nonmembers on non-Indian land within a reservation subject to two articulated exceptions: (1) nonmembers who enter into consensual relationships with the tribe or its members, or (2) activities that directly affect the tribe's political integrity, economic security, health, or welfare. *Id.* at 446. The Court ultimately determined that *Montana* governed the case because the road upon which the accident took place, although on tribal land, was subject to a right-of-way held by the State of North Dakota. This right-of-way rendered the stretch of road "equivalent, for nonmember governance purposes, to alienated, non-Indian land." *Id.* at 454. The Court "express[ed] no view on the governing law or proper forum when an accident occurs on a tribal road within a reservation." *Id.* at 442.

The Court addressed *Montana* again in *Atkinson Trading Company, Inc. v. Shirley*, 532 U.S. 645 (2001). In *Atkinson*, the Court held that the Navajo Nation lacked authority to impose a hotel occupancy tax on nonmembers who stayed at a hotel located on non-Indian fee land within the tribe's reservation. The Court found that because the tax fell on nonmembers on non-tribal land, the main *Montana* rule applied. As the tax fell within neither the consensual relationship exception nor the political integrity exception, it was invalid. *Id.* at 659.

In a concurring opinion, Justice Souter, joined by Justices Kennedy and Thomas, agreed with the majority that *Montana* set out the general law of tribal jurisdiction over non-Indians. According to Justice Souter, "the status of territory within a reservation's boundaries as tribal or fee land may have much to do . . . with the likelihood (or not) that the facts will exist that are relevant under the exceptions to *Montana*'s 'general proposition' that 'the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe.' That general proposition is, however, the first principle, regardless of whether the land at issue is fee land, or land owned by or held in trust for an Indian tribe." *Id.* at 659-60 (Souter, J., concurring) (internal quotation marks omitted). In other words, Justice Souter would find a presumption of no tribal jurisdiction (subject to the two *Montana* exceptions) over nonmembers regardless of the status of the land.

The Supreme Court continued its development of the *Montana* rule when it decided *Nevada v. Hicks*, 533 U.S. 353 (2001). Nevada game wardens and tribal police officers executed a search warrant issued by a state court upon the residence of Floyd Hicks, a tribal member, whose home was on the reservation. Hicks sued various state and tribal officials, contending that the search exceeded the bounds of the warrant, and that some of his property was damaged. After some parties were dismissed, Hicks' action proceeded in tribal court against several state game wardens in their individual capacities.

The game wardens and the State of Nevada filed a federal declaratory relief action seeking a ruling that the tribal court lacked jurisdiction over the case. The district court and we ruled in favor of tribal jurisdiction. We concluded that the tribal court had "civil jurisdiction" because the Tribe had the "right to adjudicate disputes arising out of actions within tribal regulatory authority that take place on Indian land[.]" *Nevada v. Hicks*, 196 F.3d 1020, 1031-32 (9th Cir. 2000).

The Supreme Court disagreed, holding that the tribal court lacked jurisdiction to hear the claims against the state officers, even though the search occurred on tribal land. 533 U.S. at 374. The Court clarified that its holding was limited to the question of tribal court jurisdiction over state officers, and that it was leaving open the question of tribal court jurisdiction over nonmember defendants in general. *Id.* at 358 n.2.

In reaching its conclusion, the Supreme Court applied "the general rule of *Montana* . . . to both Indian and non-Indian land. The ownership status of the land, in other words, is only one factor to consider in determining whether regulation of the activities is 'necessary to protect tribal self-government or to control internal relations.' " *Id.* at 359-60. The Court ultimately held neither *Montana* exception applied to bestow jurisdiction upon the Tribe.

Six justices in *Nevada v. Hicks* endorsed the premise first articulated by Justice Souter in *Atkinson* that the general *Montana* rule applies equally to conduct by nonmembers on tribal land and on non-Indian land within a reservation. *Id.* at 381 (Souter, J., concurring, joined by Kennedy, J., and Thomas, J.) ("After *Strate*, it is undeniable that a tribe's remaining inherent civil jurisdiction to adjudicate civil claims arising out of acts committed on a reservation depends in the first instance on the character of the individual over whom jurisdiction is claimed, not on the title to the soil on which he acted."); *id.* at 387 (O'Connor, J., concurring in part and concurring in judgment, joined by Stevens, J., and Breyer, J.)

("Today, the Court finally resolves that *Montana v. United States* governs a tribe's civil jurisdiction over nonmembers regardless of land ownership." (citation omitted)). As previously noted, Justice Scalia's majority opinion is somewhat equivocal on the point, stating in footnote two that it is leaving the question open, but later seemingly applying the general *Montana* rule, despite the fact that the search occurred on Indian land. Justice Ginsburg published a separate concurrence in order to note that the Court had not created any general rule concerning nonmember defendants in tribal courts. *Id.* at 386 (Ginsburg, J., concurring) ("The Court's decision explicitly 'leaves open the question of tribal-court jurisdiction over nonmember defendants in general.' " (quoting *id.* at 358 n.2)).

The Todecheenes and the tribe assert that the general *Montana* rule does not apply because the accident occurred on a tribal road. This argument draws support from two of our recent decisions. The first case, *Allstate Indemnity Co. v. Stump*, 191 F.3d 1071, 1072 (9th Cir. 1999), decided prior to the Supreme Court's *Hicks* decision, involved an action arising from a car accident on a road within a reservation. The driver of the car and both passengers, who were killed in the accident, were members of the Chippewa Cree Tribe. The driver was insured by Allstate through a policy purchased outside the reservation. *Id.* Eventually, the coverage issue was resolved, but an insurance bad faith action remained. *Id.* at 1073. Allstate brought a federal action challenging the tribal court's jurisdiction over the bad faith action. The district court ruled that the tribal court had jurisdiction under the "consensual relationship" exception set forth in *Montana*, holding that "the dispute arose out of the consensual relationship between Allstate and its insured[.]" *Id.* We determined that the "*Montana* rule governs only disputes arising on non-Indian fee land, not disputes on tribal land," and stayed the federal court action to allow exhaustion of the jurisdictional question (including the question of whether the cause of action arose

on the tribal road where the accident took place, or at All-state's off-reservation offices). *Id.* at 1074, 1076.

In the second and more recent case, *McDonald v. Means*, 309 F.3d 530 (9th Cir. 2002) (amended opinion), a tribal member brought an action against a nonmember whose horse had wandered onto a BIA road within the reservation, causing an accident. The horse owner sued to enjoin the tribal court proceeding for lack of jurisdiction. We held that the BIA road could not be considered equivalent to non-Indian fee land and, applying *Strate*, concluded that the tribal court had jurisdiction over the suit. The amended opinion distinguished the Supreme Court's *Hicks* decision by concluding that the holding in *Hicks* is limited to suits against state officers enforcing state law, and that the presumption against jurisdiction in *Montana* and *Strate* applies only to suits concerning activities of nonmembers on non-Indian land. *Id.* at 540 & n.9.

The district court in this case in turn distinguished *McDonald* on two grounds. First, the court determined that although this case and *McDonald* both involved car accidents, the underlying theory in this case is products liability and thus the status of the land is less important. The court noted that application of *McDonald* to product liability actions "is problematic because any manufacturer, or any individual, would be subject to litigation in tribal court simply because the injury occurred on Indian land." 221 F. Supp. 2d at 1081.

Second, the court noted that McDonald's horse wandered onto the tribal road and that the tribe had a significant interest in exercising its sovereignty to keep livestock off its public roads. *Id.* No similar trespassory interest exists in a product liability case.

After distinguishing the *McDonald* holding, the district court proceeded to analyze the case beginning with the general *Montana* premise "that tribal courts do not generally have jurisdiction over nonmembers." *Id.* (citation omitted). The

district court then addressed the two *Montana* exceptions: (1) consensual relations, and (2) tribal self-government.

The consensual relations contention in this case is predicated upon the fact that Ford Credit, the wholly-owned subsidiary of Ford, financed the vehicle involved in the accident and bulk-purchases of vehicles by the Navajo tribe over several years. *Id.* The financing agreements provided that "actions which arise out of this Lease or out of the transaction it represents shall be brought in the courts of the Navajo Nation." *Id.* at 1082.

The district court identified *Strate* as its guidepost for assessing whether this case falls within the consensual relationship exception. *Id.* The court described the relationships discussed in *Strate* that fell within the exception — on-reservation direct sales, taxing of nonmember-owned livestock within reservation boundaries, and taxing of businesses operating on the reservation. *Id*. at 1082-83. The district court concluded that "[m]easured against these cases, a products liability case involving a single car roll-over and an allegedly defective seatbelt presents a questionable consensual relationship at best . . . . [T]he mere fact that a non-Indian was on the reservation, or a manufacturer's product was in use, is not enough to confer jurisdiction in the tribal courts over all conceivable claims arising out of the non-Indian's presence on the reservation." *Id.* at 1083. The district courts also discounted the effect of the forum selection clause in the financing agreement because, in the court's view, the lawsuit was "wholly unrelated" to the agreement between the tribe and Ford Credit.

The district court also rejected the notion that the tribal self-government exception applied in this case. The court concluded that "a single vehicle roll-over underlying a products liability lawsuit does not require a unique tribal court remedy and is not likely to be the type of conduct that the Supreme Court intended to fall within the second *Montana* exception

as it does not threaten or have a sufficiently adverse effect on the political integrity, the economic security, or the health or welfare of the tribe as a whole." *Id.* at 1084.

**[3]** The district court's thorough discussion of the seminal cases on tribal jurisdiction underscores the somewhat equivocal nature of governing precedent. In *Montana*, the United States Supreme Court pointed out that the "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation." 450 U.S. at 564 (citations omitted). Despite this signal of limited tribal jurisdiction, in *Strate*, the Court expressly declined to decide the scope of tribal jurisdiction "when an accident occurs on a tribal road within a reservation." 520 U.S. at 442.

In *Atkinson*, the Supreme Court observed that "Indian tribes have lost any right of governing every person within their limits except themselves[.]" 532 U.S. at 650 (citation omitted). Nevertheless, the Court decided the tribal jurisdiction question on a much narrower basis: that the Tribe's sovereignty did not extend to allow taxation of nonmember activities (hotel stays) on nonmember land within a reservation. *Id.* at 659.

In *Hicks*, a majority of the justices endorsed the concept that the *Montana* rule applies equally to conduct by nonmembers on tribal land as to activities by nonmembers on non-tribal land. 533 U.S. at 381, 387. However, the Court's opinion expressly reserved for a future date "the question of tribal-court jurisdiction over nonmember defendants in general." *Id.* at 358 n.2.

In *McDonald*, our post-*Hicks* ruling on tribal jurisdiction, we distinguished *Hicks* by noting the Supreme Court's reservation of the issue of tribal court jurisdiction over nonmembers generally. 309 F.3d at 540. We emphasized the limited

holding in *Hicks,* addressing only "tribal-court jurisdiction over state officers enforcing state law." *Id.* We concluded that "[t]he limited nature of *Hicks*'s holding render[ed] it inapplicable" where the issue involved nonmember conduct on tribal land. *Id.*

We now confront the issue that those cases have studiously avoided — whether the Tribe may assert jurisdiction over a nonmember for conduct on tribal land.

We agree with the district court[4] that the exercise of tribal jurisdiction is a less compelling proposition in a product liability case than in a case such as *McDonald*, where the Tribe was protecting its interest in having its roads free from trespass by neighboring livestock. If the mere occurrence of an accident on the reservation is sufficient to warrant the assertion of jurisdiction, tribal jurisdiction over nonmembers will become the rule. Such a result is incongruent with the consistently articulated direction from the Supreme Court that tribal jurisdiction does not automatically track the reservation's boundaries. Although the Supreme Court in *Strate* and in *Hicks* left open the question of the scope of tribal jurisdiction over nonmembers involved in an incident on the reservation, we cannot ignore the clear guidance from the Court that tribal jurisdiction is to be limited, rather than expanded. And our decision in *McDonald* certainly did not purport to hold that tribal jurisdiction always exists when an incident occurs on tribal property. *See McDonald*, 309 F.3d at 540 (finding jurisdiction under the particular facts of the case).

As we recently clarified in *Smith v. Salish Kootenai Col-*

---

[4]The dissent makes the point that the district court decision distinguished the *McDonald* case before *McDonald* was amended. Dissenting opinion, p. 330. However, the amendments to *McDonald* primarily emphasized the tribal status of the land and explained why, in the panel's view, the limited ruling in *Hicks* left *Montana* intact. These amendments to *Montana* in no way undermine the district court's analysis.

*lege*, 378 F.3d 1048 (9th Cir. 2004), "[a]ny time a tribal court wishes to exercise civil subject matter jurisdiction over a non-member of the tribe, the framework in *Montana* . . . must be satisfied." *Id.* at 1051 (citations omitted). Although "it might have been [previously] thought that *Montana* analysis applies only when there are non-members *and* the claim arose on non-tribal land[,] [w]e have . . . rejected such a narrow reading of *Montana*. *Id.* at 1051-52 (citation omitted) (emphasis in the original).

In *Smith*, we cited our prior decision in *Yellowstone County v. Pease,* 96 F.3d 1169, 1174 (9th Cir. 1996), describing our holding "that a contention that *Montana* applies only when there are non-members *and* the activity arose on non-tribal land was unpersuasive." *Id.* at 1052 (citation and internal quotation marks omitted) (emphasis in *Smith*). Our holdings in *Smith* and *Pease* inform and support our premise "that the general rule of *Montana* applies to both Indian and non-Indian lands." *Hicks*, 533 U.S. at 360. As the Supreme Court instructed in *Strate*: "We begin with petitioners' contention that *National Farmers* and *Iowa Mutual* broadly confirm tribal court civil jurisdiction over claims against nonmembers arising from occurrences on any land within a reservation. We read our precedent differently." 520 U.S. at 448.

The determinative question, then, is whether the activities of the nonmembers fall within one of the two exceptions to the limited tribal sovereignty articulated in *Montana*: (1) consensual relations, or (2) tribal self-government. *Montana*, 450 U.S. at 565-66. Otherwise, "the inherent sovereign powers of an Indian tribe . . . do not extend to the activities of nonmembers of the tribe." *Strate*, 520 U.S. at 445-46 (citation omitted).

### 1. Consensual Relations Exception

Tribes retain the power to "regulate, through taxation, licensing, or other means, the activities of nonmembers who

enter consensual relations with the tribe or its members, though commercial dealings, contracts, or other arrangements." *Montana*, 450 U.S. at 565. Navajo Nation and the Todecheenes argue that Ford, through its subsidiary, Ford Credit, had a consensual commercial relationship with the Navajo Nation because of the lease-purchase agreements with the Tribe for vehicles (including the Ford Expedition driven by Todecheene).[5]

[4] Generally, a fairly direct link between the asserted commercial relationship and the lawsuit is required to support the assertion of tribal jurisdiction. In *Strate*, the Supreme Court determined that the consensual relationship exception did not apply even though A-1 Contractors (which owned one of the vehicles involved in the accident) was engaged in subcontract work on the reservation and therefore had a consensual relationship with the Tribe. The Court explained that the party with connections to the Tribe was not a party to the subcontract, "and the Tribes were strangers to the accident." 520 U.S. at 457 (citation, internal quotation marks and alteration omitted). The Court determined that the contractual relationship was not the type the Court had in mind when it decided *Montana*. *Id.* (listing situations fitting within the exception, including lawsuits arising out of on-reservation sales transactions between members and nonmembers; a permit tax on nonmember-owned livestock within the reservation; a privilege tax on businesses within the reservation; and a tax upon on-reservation cigarette sales); *see also Atkinson*, 532 U.S. at 656 ("*Montana*'s consensual relationship exception requires that the tax or regulation imposed by the Indian tribe have a nexus to the consensual relationship itself."); *cf. FMC*, 905 F.2d at 1314-15 (holding that tribe had jurisdiction to enforce tribal employment ordinance on nonmember employer operating a plant on non-Indian land within the reservation when the

---

[5]This analysis assumes, without deciding, that Ford Credit is the agent or alter ego of Ford.

employer had extensive agreements with the tribe, including one relating to employment).

**[5]** The contract between Ford Credit and the Tribe was a financing agreement for purchased vehicles. Ford Credit retained a security interest in the Ford Expedition until the loan was paid in full. The contract also contained a forum selection clause stating that "[a]ll actions which arise out of this Lease or out of the transactions it represents shall be brought in the courts of the Navajo Nation." This clause does not appear to cover a product liability tort action. Rather it seems to be directed toward contract disputes ("actions which arise out of this Lease").

**[6]** This case falls close to the facts of *Strate*. Although the Ford Expedition was financed through the contract, Todecheene was not a party to the contract and this action involves her parents' lawsuit against Ford, not any lawsuit initiated by the Tribe. In addition, although "but for" the lease agreement Todecheene would not have been driving the Ford Expedition, this product liability action is considerably removed from the agreement itself. *See County of Lewis v. Allen*, 163 F.3d 509, 515 (9th Cir. 1998) (en banc) (characterizing the consensual relation cases as "involv[ing] either direct regulation by a tribe of non-Indian activity on the reservation or lawsuits between a private party and the tribe or tribal members arising from an on-reservation transaction or agreement") (citation omitted).

The consensual relations exception recognizes that tribes have jurisdiction to regulate consensual relations "through taxation, licensing, or other means." *Montana*, 450 U.S. at 565. The question here is whether "other means" includes tort law. Tort law does constitute a form of regulation. *See Young v. Anthony's Fish Grottos, Inc.*, 830 F.2d 993, 1000 (9th Cir. 1987) (recognizing that the implied covenant tort regulates the employment relationship); *see also Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 337-38 (5th Cir. 1995) (state tort law may

result in "indirect regulatory impact"). But the Supreme Court in *Strate* appears to have required that the regulation be more directly connected to the contract itself.[6] It would not be illogical to say that Ford agreed to finance the purchase of the Expedition, that the Expedition possibly had a defect, and that the tribe thus has jurisdiction to adjudicate Ford's liability. But one would be hard-pressed to argue convincingly that the product liability action has a direct nexus to the lease itself. It appears somewhat arbitrary to conclude that the Tribe has a greater interest in regulating product defects in vehicles it leases (for which there is a contract between the Tribe and Ford Credit) than in vehicles it purchases for cash (for which there would be no contract with Ford Credit).

[7] As the Supreme Court stated so aptly in *Atkinson*, "[a] nonmember's consensual relationship in one area thus does not trigger tribal civil authority in another — it is not 'in for a penny, in for a pound.' " 532 U.S. at 656 (citation and internal quotation marks omitted). We agree with the district court

---

[6]Construing the *Montana* exception is obviously not an exercise in statutory construction. Nevertheless, when the Supreme Court construes statutory language, it generally follows the interpretative maxim *ejusdem generis*. This canon instructs that "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-115 (2001) (internal citations and quotation marks omitted). Following this interpretive approach, only forms of regulation similar in nature to taxation and licensing would come within the catch-all phrase "other means." Taxation and licensing are direct forms of tribal involvement with the transaction (either by collecting money from it or by authorizing it through a license). The strongest case for the Todecheenes would be that product liability law directly regulates this transaction by ensuring that Ford is selling a non-defective product. But that interpretation threatens to swallow the rule, because it is difficult to envision how the Tribe has a greater interest in regulating defective products that enter the reservation through lease or financing contracts than those that enter the reservation unaccompanied by the execution of a contract. More distinctly, enforcement through the prolonged and uncertain vehicle of litigation is worlds apart from taxation and licensing mechanisms.

that the existence of the financing agreement did not support application of the consensual relations exception.

## 2.   Tribal Self-Government

Tribal courts may also exercise jurisdiction over nonmembers where the conduct of nonmembers "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 566 (citations omitted). The Navajo Nation and the Todecheenes contend that the Tribe's inability to adjudicate the product liability case against Ford would adversely affect its political integrity and its ability to provide for the health and welfare of its members.

[8] Despite its seemingly broad sweep, the Supreme Court in *Strate* clarified that the self-government exception is rather narrow:

> Read in isolation, the *Montana* rule's second exception can be misperceived. Key to its proper application, however, is the Court's preface: "Indian tribes retain their inherent power to punish tribal offenders, to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members. . . . But a tribe's inherent power does not reach beyond what is necessary to protect tribal self-government or to control internal relations."

*Strate*, 520 U.S. at 459 (quoting *Montana*, 450 U.S. at 564) (alterations and internal quotation marks omitted); *see also County of Lewis*, 163 F.3d at 515 (noting the narrowness of the exception).

Examination of prior court rulings reveals that the circumstances of this case fall short of the dictates of the tribal self-government exception described in *Montana*.

In *Hicks*, the United States Supreme Court reiterated "that what is necessary to protect tribal self-government and control internal relations can be understood by looking at the examples of tribal power to which *Montana* referred . . . These examples show, we said, that Indians have the right to make their own laws and be ruled by them[.]" 533 U.S. at 360-61 (citations, internal quotation marks and alteration omitted). "Tribal assertion of regulatory authority over nonmembers must be connected to that right of the Indians to make their own laws and be governed by them." *Id.* (citation omitted).

**[9]** In *Wilson v. Marchington*, 127 F.3d 805 (9th Cir. 1997), we explained that a traffic accident occurring on a road running through a reservation does not implicate the type of inherent power concerns necessary to meet the second *Montana* exception. In addressing this issue, we noted that the Supreme Court specifically rejected the argument "that a traffic accident injuring a tribal member sufficiently affects the economic security, political integrity, or health and welfare of the tribe. . ." *Id.* at 814 (internal citation omitted). The Supreme Court explained that it had rejected an identical argument in *Strate*, reflecting that "[u]ndoubtedly, those who drive carelessly on a public highway running through a reservation endanger all in the vicinity, and surely jeopardize the safety of tribal members. But if *Montana*'s second exception requires no more, the exception would severely shrink the rule." *Id.* (citation omitted). Although the *Wilson* case involved a public highway running through a reservation and this case concerns a tribal road running through a reservation, no principled basis exists for finding that in the former instance an automobile accident implicates tribal self-governance and in the latter instance it does not.

The dissent makes much of the fact that the second *Montana* exception was tailored, and precisely worded, for "cases involving conduct on non-Indian fee lands within the reservation." Dissenting opinion, p. 323; *see also* p. 328. However, the contention that the *Montana* exceptions apply only to con-

duct on non-Indian fee land was expressly repudiated by *Hicks*. *See* 533 U.S. at 360 (noting "that the general rule of *Montana* applies to *both* Indian *and non-Indian land*") (emphasis added).

Our colleague in dissent also reminds us that "tribal ownership of the land on which an incident occurs is a 'significant' factor that 'may *sometimes* be dispositive.' " Dissenting opinion, p. 326 (emphasis added). But *sometimes* is not *always*. And this case is not one of those times when ownership should be considered a dispositive factor in the *Montana* analysis. There is absolutely nothing in the record to support the premise that the status of the land impacted potential liability in this case. This case does not involve encroachment upon tribal land, damage to tribal land, interference with the use of tribal land, or any other effect upon tribal land that might prove dispositive.

The dissent also chastises us for not being more verbose in distinguishing *McDonald*. Dissenting opinion, p. 330. However, verbosity is not required to state what the *McDonald* panel itself recognized: the holding in *McDonald* is not a holding for all seasons and all reasons. As we recognized in *Smith*, the panel in *McDonald* held only "that the exercise of jurisdiction *in that case* was permissible under *Montana*." 378 F.3d at 1052, n.4 (internal quotation marks omitted) (emphasis added). Central to *McDonald*'s ruling was the fact that a non-member's horse had wandered onto the roads of the reservation, thereby impacting the interest of the tribe in keeping its roadways free from obstruction. No similar circumstance existed in this case.

The *McDonald* panel did not purport to rule that tribal jurisdiction is mandated when an incident occurs on tribal land. Rather, its holding was limited to the facts of that particular case. As we ruled in *Smith*, [b]ecause the general rule of *Montana* applies to both Indian and non-Indian land . . . we are required to start with a presumption that the tribal court

did not have jurisdiction." 378 F.3d at 1053 (citations and internal quotation marks omitted). That presumption can be rebutted only if the conduct falls within one of the articulated *Montana* exceptions. *See id.* Nothing in *McDonald* compels a different approach.

As we noted in *Smith*, "if the plaintiff is a member [as are the Todecheenes], the defendant is a non-member [as is Ford], and the action arises on tribal lands [as occurred in this case], the subtleties of the cases have led us to differing results . . . depending on the precise facts." *Id.* (citations omitted). Under the precise facts of this case, where ownership of the land did not impact liability in any way, *McDonald* does not dictate the outcome.

**[10]** That brings us to the dissent's final criticism of the majority opinion—that it does not agree with the dissent that a rollover accident implicates the tribe's self-government interest. Dissenting opinion, p. 331. Although the tribe does have an interest in protecting the lives of its police officers on tribal roads, unfortunately that interest does not fit within the parameters of the self-government *Montana* exception. That exception has been narrowly defined as encompassing events that interfere with a Tribe's ability to enact or be governed by its own laws. *See Hicks*, 533 U.S. at 360-61. Although tragic, there is no indication in the record that the death of this tribal police officer in a rollover accident in any way prevented the Tribe from enacting or being governed by its laws. Evocation of a sympathetic reaction cannot erase the Supreme Court's narrowing interpretation of the tribal government *Montana* exception.

**[11]** In sum, we agree with the district court that neither of the *Montana* exceptions applied in this case, and no tribal jurisdiction existed.

### B.   Exhaustion

The tribal court was afforded the opportunity to make an initial determination regarding the existence of tribal jurisdic-

tion over this case. That is all the exhaustion that is required. *See Sharber v. Spirit Mountain Gaming, Inc.*, 343 F.3d 974, 975 (9th Cir. 2003) (per curiam). Consequently, there is no need to remand the case to tribal court for purposes of exhaustion.

## IV.   CONCLUSION

Under *Montana v. United States*, the tribal court's limited jurisdiction over nonmembers was in effect, because this case did not fall within either the consensual relations or self-government exceptions articulated in *Montana*. The matter was sufficiently exhausted in federal court. Accordingly, the judgment of the district court is

**AFFIRMED.**

---

W. FLETCHER, Circuit Judge, dissenting:

The question in this case is whether a tribal court has jurisdiction over a product liability suit brought by the surviving parents of a tribal police officer, where the on-duty officer, driving a police vehicle designed, manufactured, and sold to the tribe by the defendant, was killed in a one-car rollover accident on a tribal road. The majority denies tribal court jurisdiction despite our recent decision in *McDonald v. Means*, 309 F.3d 530, *amending prior opinion at* 300 F.3d 1037 (9th Cir. 2002), holding that tribal courts have subject matter jurisdiction over a suit between a tribal member and a nonmember arising out of an accident on a tribal road. The majority may not like our decision in *McDonald*, but it is bound by it. Because the majority fails to follow *McDonald*, I respectfully dissent.

### I.   Factual Background

Plaintiffs are the parents of Esther Todecheene, a deceased Navajo Nation law enforcement officer. Officer Todecheene

died from injuries sustained when her Ford Expedition patrol vehicle rolled over in a one-car accident. The rollover occurred while Officer Todecheene was on duty, driving on a tribal road.

The Navajo Nation had bought the Ford Expedition for use as a police vehicle through one of the many bulk purchases it had arranged with Ford Motor Credit Company, a wholly owned subsidiary of defendant Ford Motor Company ("Ford"). The Todecheenes sued Ford for damages in the tribal court of the Navajo Nation, alleging that defects in the design or manufacture of the Expedition caused the rollover. Ford first sought to remove the Todecheenes' suit to federal court, but the district court remanded to the tribal court because there is no statute permitting removal from tribal courts to federal district court. *See Nevada v. Hicks*, 533 U.S. 353, 368-69 (2001). After remand, the Navajo Nation tribal court held that it had jurisdiction.

Ford then brought suit in federal district court, contending that the tribal court did not have jurisdiction. Without the benefit of our amended opinion in *McDonald*, the district court held that the tribal court lacked jurisdiction over the Todecheenes' suit. The district court preliminarily enjoined the Todecheenes from pursuing their suit in tribal court. The Todecheenes appeal that ruling to us.

## II.   Supreme Court Case Law

The Supreme Court has not answered the precise question posed in this case. In *Montana v. United States*, 450 U.S. 544 (1981), the Court addressed the question whether a tribe could regulate hunting and fishing by non-Indians on non-Indian property located within the reservation. The Court held that a tribe could not regulate the activities of non-Indians on non-Indian fee lands except under two circumstances. First, "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual

relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Id.* at 565. Second, "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 566. The precise wording of the second exception is tailored to cases involving conduct on non-Indian fee lands within the reservation. The exception does not purport to provide a rule for cases involving conduct on tribal land.

In *Strate v. A-1 Contractors*, 520 U.S. 438 (1997), decided sixteen years later, the Court imported *Montana*'s analysis of a tribe's regulatory reach into its analysis of a tribal court's subject matter jurisdiction and held that "[a]s to nonmembers, . . . a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction." *Id.* at 453. The Court in *Strate* held that a tribal court had no jurisdiction over a suit brought by tribal members against nonmembers arising out of an automobile accident on a state highway within the reservation. In a case arising on non-Indian land, the Court was careful to adhere to its earlier formulation of the second exception in *Montana*. It wrote:

> Read in isolation, the *Montana* rule's second exception can be misperceived. Key to its proper application, however, is the Court's preface: "Indian tribes retain their inherent power [to punish tribal offenders,] to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members. . . . But [a tribe's inherent power does not reach] beyond what is necessary to protect tribal self-government or to control internal relations." 450 U.S. at 564. Neither regulatory nor adjudicatory authority over the state highway accident at issue is needed to preserve "the right of reservation Indians to make their own laws

and be ruled by them." *Williams* [*v. Lee*, 358 U.S. 217, 220 (1957)]. The *Montana* rule, therefore, and not its exceptions, applies to this case.

*Id.* at 459 (ellipses and all brackets except the last in original). The Court in *Strate* was also careful to state that its holding — and its narrow reading of *Montana*'s second exception — were confined to a case in which the accident occurred on non-Indian land. It wrote, "We express no view on the governing law or proper forum when an accident occurs on a tribal road within a reservation." *Id.* at 442.

Finally, in *Nevada v. Hicks*, decided four years after *Strate*, the Court held that a tribal court did not have jurisdiction over "civil claims against state officials who entered tribal land to execute a search warrant against a tribe member suspected of having violated state law outside the reservation." 533 U.S. at 355. As in *Strate*, the Court was careful to note the limited nature of its holding: "Our holding in this case is limited to the question of tribal-court jurisdiction over state officers enforcing state law. We leave open the question of tribal-court jurisdiction over nonmember defendants in general." *Id*. at 358 n.2. Although the Court in *Hicks* denied tribal jurisdiction over a suit arising out of an incident on tribal land, it stated explicitly that Indian land ownership remains a relevant factor in the jurisdictional calculus. It wrote, "The ownership status of land . . . is only one factor to consider in determining whether regulation of the activities of nonmembers is 'necessary to protect tribal self-government or to control internal relations.' " *Id*. at 360 (quoting *Montana*, 450 U.S. at 564).

Justice O'Connor wrote a separate concurrence in *Hicks*, which the Court characterized as "in large part a dissent from the views expressed in [the] opinion." *Id*. at 370. Justice O'Connor contended that the Court's opinion in *Hicks* gave short shrift to the tribe's ownership of the land on which the incident had taken place. In replying, the Court emphasized

the importance of tribal land ownership in the jurisdictional calculus. It wrote:

> The principal point of [Justice O'Connor's] concurrence is that our reasoning "gives only passing consideration to the fact that the state officials' activities in this case occurred on land owned and controlled by the Tribes." According to Justice O'Connor, "that factor is not prominent in the Court's analysis." Even a cursory reading of our opinion demonstrates that this is not so. To the contrary, we acknowledge that tribal ownership is a factor in the *Montana* analysis, and *a factor significant enough that it "may sometimes be . . . dispositive."*

*Id*. at 370 (emphasis added; internal citations omitted; ellipsis in original).

Justice Souter also wrote a separate concurrence in *Hicks*. He wrote that he would reach the Court's conclusion but "by a different route." *Id.* at 375. Justice Souter's route deviated from the Court's in that he attached less importance to the ownership status of the land. Unlike the Court, Justice Souter said that he "would thus make it explicit that land status within a reservation is not a primary jurisdictional fact, but is relevant only insofar as it bears on the application of one of *Montana*'s exceptions to a particular case." *Id.* at 375-76. But Justice Souter made clear that even in his view the status of land remained relevant: "Thus, it is not that land status is irrelevant to a proper *Montana* calculus, only that it is not determinative in the first instance. Land status, for instance, might well have an impact under one (or perhaps both) of the *Montana* exceptions." *Id.* at 382 n.4.

As is evident from the foregoing, the Supreme Court has not answered the question whether a tribal court has jurisdiction over a suit between a tribal member and a nonmember arising out of an accident on a tribal road. Indeed, the forego-

ing makes clear that the Court has specifically avoided answering that question. But, at the very least, as the Court indicated in its opinion in *Hicks*, tribal ownership of the land on which an incident occurs is a "significant" factor that "may sometimes be . . . dispositive."

### III.    *McDonald v. Means*

In *McDonald v. Means*, decided in 2002, a year after the Supreme Court's decision in *Hicks*, we held that a tribal court had jurisdiction over a suit between a tribal member and a nonmember arising out of an accident on a tribal road. In so holding, we answered the question that had been left open by the Court. As the dissenting judge wrote in *McDonald*, we were answering "a question of first impression." 309 F.3d at 543 (Wallace, J., dissenting).

The facts in *McDonald* were straightforward. McDonald, who was not a member of the Cheyenne Tribe, owned a horse that had wandered onto a Bureau of Indian Affairs ("BIA") road within the Northern Cheyenne Indian Reservation. Means, a member of the Cheyenne Tribe, was seriously injured when his car struck the horse. Means's guardian brought suit in tribal court against McDonald and his family, who objected to the court's jurisdiction.

We carefully considered *Hicks*, as well as *Montana* and *Strate*, and concluded that they did not answer the question before us. We wrote:

> McDonald argues that the majority's analysis "is not consistent with" the Supreme Court's decision in *Nevada v. Hicks*, that the ownership status of land is not dispositive in determining that a tribal court lacks jurisdiction over a civil claim against state officers who enter tribal land to execute a search warrant against a tribe member suspected of having violated state law outside the reservation. However, the Court

noted that "[o]ur holding in this case is limited to the question of tribal-court jurisdiction over state officers enforcing state law. We leave open the question of tribal-court jurisdiction over nonmember defendants in general." The limited nature of *Hicks*'s holding renders it inapplicable to the present case.

*McDonald*, 309 F.3d at 540 (citations omitted).

In a footnote, we explained in detail why we did not read *Hicks* to bar jurisdiction in the tribal court:

McDonald argues that *Hicks* suggests the rule in *Montana* should be extended to bar tribal jurisdiction not only over the conduct of nonmembers on non-Indian fee land but on tribal land as well. *See* [*Hicks,*] 533 U.S. at 359 (interpreting *Montana* to state a " 'general proposition [that] the inherent sovereign powers of an Indian Tribe do not extend [to] the activities of non-members of the tribe' except to the extent 'necessary to protect tribal self-government or to control internal relations' "). *Montana* itself limited its holding to nonmember conduct on non-Indian fee land, 450 U.S. at 557, ("[T]he power of the Tribe to regulate non-Indian fishing and hunting on reservation land owned in fee by non-members of the Tribe."), and *Strate* [*v. A-1 Contractors*] confirmed that limitation, 520 U.S. [438,] 446 [(1997)] ("*Montana* thus described a general rule that . . . Indian tribes lack civil authority over the conduct of nonmembers on non-Indian land within a reservation. . . .["]). Even if *Hicks* could be interpreted as suggesting that the *Montana* rule is more generally applicable than either *Montana* or *Strate* have allowed, *Hicks* makes no claim that it modifies or overrules *Montana*. . . . *Montana* limits its scope to a Tribe's civil authority over the conduct of nonmembers on non-Indian fee land, and *Strate* affirms

that limitation. Our holding therefore fits squarely within *Montana*, which both *Strate* and *Hicks* characterize as the "pathmarking case." *See Hicks*, 533 U.S. at 358; *Strate*, 520 U.S. at 445.

*Id.* at 540 n.9 (parallel citations omitted).

We held that the BIA road was a tribal road, and that the tribal court had jurisdiction over the suit between Means, who was a tribal member, and McDonald and his family, who were nonmembers:

> We hold that the nature and the purpose of the grant [of the road to the BIA], the continuing control exercised by the Tribe over the road, and the Supreme Court's previous treatment of BIA roads support the conclusion that the tribal court has jurisdiction to entertain Means's suit against the McDonald family.

*Id.* at 540. *McDonald* was explicitly based on the fundamental principle contained in Supreme Court case law that "[t]ribes maintain considerable authority over the conduct of both tribal members and nonmembers on Indian land, or land held in trust for a tribe by the United States." *Id.* at 536.

## IV.   The Majority Opinion

The majority wants to ignore inconvenient aspects of the Supreme Court cases on which it relies. The second exception in *Montana* allows tribal court jurisdiction over suits involving conduct that "threatens" or "has some direct effect on the political integrity, the economic security, or the health and welfare of the tribe." 450 U.S. at 566. The majority emphasizes the precise wording of the exception, and in particular the precise wording of its stated purpose, as formulated in *Montana* and later recited in *Strate*. Maj. Op. at 317. What the majority does not emphasize is that the precise wording of the

exception and its stated purpose were chosen and applied in two suits involving conduct on non-Indian land. When, by contrast, the Court addressed conduct on tribal land in *Hicks*, it did not rely on that precise wording. Rather, it now referred to the "general rule" of *Montana*. 533 U.S. at 360. It wrote that under that general rule, "[t]he ownership status of land . . . is only one factor to consider in determining whether regulation of the activities of nonmembers is 'necessary to protect tribal self-government or to control internal relations.' It may sometimes be a dispositive factor." *Id.*

In *Hicks*, the precise wording of *Montana*'s second exception became a general test based on the strength of the tribe's interest in self-government. The Court in *Hicks* held that the tribe's ownership of the land, and its accompanying interest in self-government, did not outweigh the state's interest in executing its search warrant on tribal land. "We simply do not find [the fact that the state officials' activities in this case occurred on land owned and controlled by the Tribe] dispositive in the present case, when weighed against the State's interest in pursuing off-reservation violations of its laws." *Id.* at 370. But, at the same time, the Court "acknowledge[d] that tribal ownership is a factor in the *Montana* analysis, and a factor significant enough that it 'may sometimes be . . . dispositive.' " *Id.*

The majority prefers the separate concurrences of Justices Souter and O'Connor to the opinion of the Court in *Hicks*, for they de-emphasize the importance of tribal ownership of land. But these concurrences do not have the force of law. Justice Souter himself acknowledged that his concurrence took a "different route" from the opinion of the Court, *id.* at 375, and the Court responded to Justice O'Connor's separate concurrence by noting that it was "in large part a dissent." *Id.* at 370.

After *Hicks*, the "general rule" of *Montana* applies to activities on both Indian and non-Indian land. On non-Indian land, the precise wording of *Montana*'s second exception may or

may not still apply. On tribal land, however, the precise word-
ing of the second exception has pretty clearly been replaced
by a "general rule" in which the strength of the tribe's interest
in self-government is weighed against the interest of the
defendant who does not want to appear in tribal court. After
*Hicks*, a court should weigh — as the *Hicks* Court did — the
tribe's ownership of the land and accompanying interest in
self-government, on the one hand, and the countervailing
interest of the nonmember defendant on the other.

The majority also wants to ignore our decision in *McDon-
ald*. It spends several pages analyzing the Supreme Court
cases, including *Montana*, *Strate*, and *Hicks*, that we held in
*McDonald* did not answer the jurisdictional question posed by
a suit arising out of an accident on a tribal road. Maj. Op. at
304-09. The majority then relies heavily on the district court's
analysis in this case distinguishing *McDonald,* even though
the district court relied on our first, unamended opinion in
*McDonald*, which did not address *Hicks*. *Id.* at 13-15.

The majority distinguishes *McDonald* on the asserted
ground that in that case the tribe's interest in self-government
was greater than in this case. It writes, "Central to *McDon-
ald*'s ruling was the fact that a non-member's horse had wan-
dered onto the roads of the reservation, thereby impacting the
interest of the tribe in keeping its roadways free from obstruc-
tion. No similar circumstance existed in this case." Maj. Op.
at 319. I agree that a tribe has an interest in the safety of travel
on its tribal roads. But a tribe's interest in the safety of its
roads, including its interest in "keeping its roadways free from
obstruction," cannot logically be limited to controlling stray
livestock. The tribe's interest in the safety of its roads — and
keeping those roads "free from obstruction" — extends
equally to rollover accidents on those roads.

In its attempt to escape *McDonald*, the majority character-
izes this case as just "a product liability case." It writes:

> We agree with the district court that the exercise of tribal jurisdiction is a less compelling proposition in *a product liability case* than in a case such as *McDonald*, where the Tribe was protecting its interest in having its roads free from trespass by neighboring livestock. If the mere occurrence of an accident on the reservation is sufficient to warrant the assertion of jurisdiction, tribal jurisdiction over nonmembers will become the rule.

Maj. Op. at 312 (emphasis added). But this is not just a product liability case. It is, instead, a case in which the defendant allegedly designed and manufactured a fatally defective vehicle; the defendant sold that vehicle to the tribe for use by its police officers; and the vehicle rolled over and killed one of the tribe's police officers. Not only is this a case about the safety of the tribe's roads. Not only is this a case about the safety of products sold to tribal members. This is also a case about the ability of a tribe to ensure the safety of its police officers as those officers drive on tribal roads, protecting tribal members and enforcing tribal law.

Under the weighing process prescribed in *Hicks*, we must weigh the self-government interest of the tribe in ensuring the safety of its roads and the safety of tribal police officers while driving on those roads against the interest of the defendant in escaping the tribal court's civil jurisdiction. The majority concludes that the tribe's interest in self-government is greater in a case arising out of an accident involving a stray horse than in a case arising out of the death of a tribal police officer caused by an allegedly defective vehicle. I agree with the majority that the tribe has a self-government interest in keeping its tribal roads free of obstruction, as we held in *McDonald*. I do not understand why the majority does not agree with me that the tribe has an even greater self-government interest in protecting the lives of its police officers on those roads.

I respectfully dissent.